**SPEERT et al. v. MORGENTHAU, Secretary of the Treasury, et al.**

**No. 7621.**

United States Court of Appeals for the District of Columbia.

Decided Nov. 18, 1940.

George A. Mahone, of Baltimore, Md., and Arthur Callahan, of Washington, D. C., for appellants.

Edward M. Curran, U. S. Atty., John L. Laskey, Asst. U. S. Atty., and Phillip E. Buck, Gen. Counsel, Federal Alcohol Ad-

ministration, all of Washington, D. C., and Herbert Borkland, and S. R. Brittingham, Jr., Sp. Assts. to the Atty. Gen., for appellees.

Before GRONER, Chief Justice, and STEPHENS and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing on the appellees' motion the appellants' petition for a declaratory judgment and correlative injunctive relief. The sole question on the appeal is whether or not the petition states a cause of action.

The case arises under the act of Congress creating the Federal Alcohol Administration[1] and under certain regulations promulgated under the act. It created the Federal Alcohol Administration as a division in the Treasury Department, and provided for the appointment of an Administrator authorized to prescribe rules and regulations, subject to the approval of the Secretary of the Treasury. So far as is here pertinent the act provides that, "In order effectively to regulate interstate and foreign commerce in distilled spirits . . . to enforce the twenty-first amendment, and to protect the revenue and enforce the postal laws with respect to distilled spirits[2] . . . . It shall be unlawful, except pursuant to a basic permit issued . . . by the Administrator"[3] for any person "to engage in the business of distilling distilled spirits . . . or bottling . . . distilled spirits"[4] or when so engaged "to sell . . . or ship [the same] in interstate or foreign commerce . . ."[5] Possession of a basic permit is conditioned upon compliance with certain requirements relating to unfair competition and unlawful practices.[6] These make it "unlawful for any person engaged in business as a distiller . . . rectifier, blender, or other producer . . . or as a bottler . . . of

distilled spirits . . . ."[7] "To sell or ship or deliver for sale or shipment, or otherwise introduce in interstate or foreign commerce . . . any distilled spirits . . . unless such products are bottled, packaged and labeled in conformity with such regulations, to be prescribed by the Administrator, with respect to packaging, marking, branding, and labeling and size and fill of container (1) as will prohibit deception of the consumer with respect to such products or the quantity thereof and as will prohibit, irrespective of falsity, such statements relating to age, manufacturing processes, analyses, guarantees, and scientific or irrelevant matters as the Administrator finds to be likely to mislead the consumer; (2) as will provide the consumer with adequate information as to the identity and quality of the products, the alcoholic content thereof . . . the net contents of the package, and the manufacturer or bottler . . . of the product . . . ."[8] And the act provides that, "In order to prevent the sale or shipment or other introduction of distilled spirits . . . in interstate or foreign commerce, if bottled, packaged, or labeled in violation of the requirements . . ." of the act, "no bottler . . . shall bottle [distilled spirits] . . . unless, upon application to the Administrator, he has obtained and has in his possession a certificate of label approval covering the distilled spirits . . . ."[9] Finally, the act authorizes officers of Internal Revenue "to withhold the release of distilled spirits from the bottling plant unless such certificates have been obtained . . . ."[10]

On January 18, 1936, the Secretary of the Treasury approved "Regulations No. 5, Relating to Labeling and Advertising of Distilled Spirits," which, in Article II, Section 21, entitled "Standards of Identity for Distilled Spirits," defined whiskey as such, and certain named varieties of whiskey, including bourbon whiskey and corn whiskey,[11] and then defined straight bourbon

---

[1] Act of August 29, 1935, 49 Stat. 977, as amended by Act of February 29, 1936, 49 Stat. 1152, and Act of June 26, 1936, 49 Stat. 1965, 27 U.S.C.A. § 201 et seq.

[2] Sec. 3, first paragraph.

[3] Sec. 3(a).

[4] Sec. 3(b) (1).

[5] Sec. 3(b) (2).

[6] Sec. 4(d).

[7] Sec. 5, first paragraph.

[8] Section 5(e).

[9] Section 5(e).

[10] Section 5(e).

[11] "Class 2. *Whiskey.*—(a) 'Whiskey' is an alcoholic distillate from a fermented mash of grain distilled at less than 190° proof in such manner that the distillate possesses the taste, aroma, and characteristics generally attributed to whiskey, and withdrawn from the cistern room of the distillery at not more than 110° and not less than 80° proof, whether or not

whiskey and straight corn whiskey as follows:

"Class 2. (d) 'Straight bourbon whiskey' and 'straight corn whiskey' are straight whiskey distilled from a fermented mash of grain of which not less than 51% is corn grain.[12]"

On February 28, 1938, the Secretary approved an amendment to these regulations which caused straight corn whiskey to be defined differently from straight bourbon, thus:

"(d) (1) 'Straight bourbon whiskey' is a straight whiskey distilled from a fermented mash of grain of which not less than 51% is corn grain.

"(2) 'Straight corn whiskey' is straight whiskey distilled from a fermented mash of grain of which not less than .80% is corn grain, aged for the required period in uncharred oak containers or reused charred oak containers, and not subjected, in the process of distillation or otherwise, to treatment with charred wood.[13]"

So far as here pertinent the facts set forth in the appellants' petition and admitted under the motion to dismiss are these: On June 15, 1936, certain whiskey later acquired by the appellants was distilled under conditions which brought it within the definition of both straight bourbon whiskey and straight corn whiskey as such whiskeys were defined in the regula-

tions of January 18, 1936. But the whiskey as thus distilled did not meet the definition of corn whiskey adopted in the regulations of February 28, 1938.[14] On September 27, 1939, the appellants bottled this whiskey in containers to which were affixed labels describing the contents as "Straight Corn Whiskey." The form of the labels had been approved by the Administrator, but only for use in respect of whiskey which met the requirements of applicable regulations; and after the bottling of the whiskey its release from the bottling plant of the appellants was withheld by agents of the Treasury Department, acting under the advice of the Administrator, for the reason that the whiskey did not meet the definition of straight corn whiskey under the amended regulations. The appellants' petition does not show that they became the owners of the whiskey in question before February 28, 1938, the date of the effectiveness of the amended regulations.[15] The petition also makes no assertion that the whiskey is less marketable or less valuable if labeled as straight bourbon whiskey than it would be if labeled as straight corn whiskey.

The appellants prayed for a declaratory judgment that they are entitled to bottle the whiskey in question and to label it either as straight corn whiskey or as straight bourbon whiskey at their option, and that the appellees be ordered to refrain from inter-

---

such proof is further reduced prior to bottling to not less than 80° proof; and also includes mixtures of the foregoing distillates for which no specific standards of identity are prescribed herein. 'Rye whiskey', 'bourbon whiskey', 'wheat whiskey', 'corn whiskey', 'malt whiskey', or 'rye malt whiskey' is whiskey which has been distilled at not exceeding 160° proof from a fermented mash of not less than 51% rye grain, corn grain, wheat grain, corn grain, malted barley grain, or malted rye grain, respectively, and also includes mixtures of such whiskeys where the mixture consists exclusively of whiskeys of the same type." 1 Fed.Reg. 92 (1936).

12 1 Fed.Reg. 92 (1936).

13 3 Fed.Reg. 486 (1938).

14 Specifically, the whiskey in question was distilled "at not exceeding 160° proof from a fermented mash of grain of which not less than 51% was corn grain, and said whiskeys were withdrawn from the cistern room at the distillery at not more than 110° proof and not less than 80° proof, and were kept in oak containers

until bottled." It thus failed to fulfil the new definiton of corn whiskey in that it was distilled from a fermented mash of grain of which not less than 51% was corn grain, whereas under the amended regulations it must have been distilled from a fermented mash of grain of which not less than 80% was corn grain; and it was not, so far as appeared from the complaint, "aged . . . in uncharred oak containers or reused charred oak containers, and not subjected, in the process of distillation or otherwise, to treatment with charred wood."

15 The petition shows that the whiskey was owned by the appellants at the time of the filing of their petition in the court below on October 3, 1939, and in an allegation that "on the 15th day of June, 1936, certain whiskeys now owned by the petitioners were distilled . . ." the petition implies that the appellants did not own the whiskey on the date of its distillation; but at what date between the time of distillation and the time of filing the petition they acquired the whiskey is not stated in the petition either directly or by implication.

fering with their right to bottle, label and sell the whiskey as either straight corn whiskey or straight bourbon whiskey.

The appellants contend that their petition states a cause of action for relief against an illegal invasion of a right to bottle, label and sell the whiskey in interstate or foreign commerce as either straight corn whiskey or straight bourbon whiskey. They assert that the question in the case is whether "the defendants [appellees], as Government officials charged with the duty of enforcing the Federal Alcohol Administration Act and other statutes relating to alcoholic beverages, have the power to amend their Regulations in such manner that the amendment is retroactive, and destroys, impairs or changes a standard of identity applying to distilled spirits produced prior to the amended regulations which the defendants [appellees] have themselves set up." The appellants contend that this question must be answered in the negative. They assert that "the identity of distilled spirits attaches at the time of distillation in accordance with standards of identity in force and effect at said time, and . . . the Federal Alcohol Administration is without authority, by subsequent Amendment to its Regulations, to retrospectively effect a change in the *identity* of distilled spirits." They urge that distilling the spirits under the definitions of the original regulations resulted in a right to bottle and label the spirits as either straight corn whiskey or straight bourbon whiskey; they assert that this right vested in the original owner—the distiller or producer—and passed to the appellants as vendees "simultaneously with title to the whiskey"; and they contend that the change in definition of corn whiskey in the amended regulations is retrospective in application to the whiskey in question, and against this retrospective effect they invoke the protection of the Fifth Amendment.

We think that the trial court correctly dismissed the appellants' petition as stating no cause of action: 1. Assuming, without deciding, that the effect of the statute and regulations is to attach to spirits an identity and to create assignable rights with respect thereto—a position for which the appellants cite no authority—the statute and regulations cannot, in view of Mulford v. Smith, 1939, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, by which we are bound, be held to have that effect at the time of distillation. Under that decision they apply only to distilled spirits to be sold or shipped in interstate or foreign commerce, and they operate only at the time of introduction of such spirits into such commerce. As appears above, the statute makes it unlawful "To sell or ship or deliver for sale or shipment, or otherwise introduce in interstate or foreign commerce . . . any distilled spirits . . . unless such products are bottled, packaged and labeled in conformity with such regulations" as will protect the consumer against deception and will provide him with adequate information as to the identity and quality of the products. And the requirements of the regulations in respect of bottling, packaging and labeling do not, and of course could not validly, go beyond the statute; they merely carry it into effect by setting up standards of identity and labeling requirements; and these therefore have their incidence only at the moment of the introduction of the spirits into interstate or foreign commerce. That distillers may, indeed for practical reasons must, in order to market their product, distill in conformity with the standards of identity and labeling requirements prevailing at the time of distillation, does not constitute the act, as carried into effect through the regulations, a regulation of production. In Mulford v. Smith, supra, the Supreme Court sustained the tobacco quota and marketing provisions of the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1311 et seq., and regulations promulgated thereunder, against the contention that they controlled production. The provisions and regulations apportioned a marketing quota amongst individual farms and made marketing by a warehouseman in excess of the quota assigned to a particular farm subject to a penalty deductible from the price paid the producer. These provisions were sustained upon the ground that they did not purport to be a control of production but solely a regulation of interstate commerce where the tobacco enters the stream thereof. If such tobacco quota and marketing provisions do not control production, much less do the standards of identity and labeling requirements involved in the instant case.

Since the act and regulations operated upon, and at the time of, the introduction of distilled spirits into interstate or foreign commerce, there is no basis for complaint against the operation of the amended regulations of February 28, 1938, as retrospective. They apply prospectively to the only act to which they can apply, to wit, the introduction into commerce of the whiskey

bottled and labeled by the appellants on September 27, 1939, and on that date refused release by the appellees from the appellants' bottling plant. In Mulford v. Smith, supra, it was contended that the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., as applied to the crop year 1938, and therefore to the crop the arrangements for the planting of which were made in December, 1937, deprived the growers of their property without due process of law in violation of the Fifth Amendment. This contention was rejected upon the theory that the statute operated not on farm production but upon the marketing of the tobacco in interstate commerce and that the law, effective February 16, 1938, applied to marketing to take place about August 1 following, and was therefore not retrospective in its operation upon the activity regulated.

■ 2. Again assuming, without deciding, that the effect of the statute and regulations is to attach to spirits an identity and to create rights—in the ordinary course assignable—with respect thereto, and further assuming—to the contrary of what is said above—that the statute and regulations have that effect at the time of distillation, still it does not follow that the amended regulations must be held invalid because, under the above assumptions, retrospective. Although as a general rule vested rights cannot be impaired by retrospective legislation, this is not true in respect of regulation under the police power. While the Federal government does not have the same police power as is reserved to the states, nevertheless, once a general subject is properly within the scope of the powers granted in the constitution to the Federal government, that government has powers to prescribe police regulations concerning that subject, and these powers are as broad as those which a state government possesses concerning subjects within its reserved powers. "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other States from the State of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce . . .." Brooks v. United States, 1925, 267 U.S. 432, 436, 437, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407. See Hamilton v. Kentucky Distilleries Co., 1919, 251 U.S. 146, 156, 40 S.Ct. 106, 64 L.

Ed. 194. And the further proposition that vested rights must give way to the police power is exemplified by the same case. Therein it was contended that the Wartime Prohibition Act, 40 Stat. 1046, was void because it took property for public purposes without compensation in violation of the Fifth Amendment. The Federal police power to regulate the liquor traffic arose under the War Power. The Supreme Court recognized that "The war power of the United States, like its other powers and like the police powers of the States, is subject to applicable constitutional limitations . . .; but the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power . . .. If the nature and conditions of a restriction upon the use or disposition of property is such that a State could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation; for prohibition of the liquor traffic is conceded to be an appropriate means of increasing our war efficiency." (251 U.S. at pages 156, 157, 40 S.Ct. page 108, 64 L.Ed. 194.) See also National Fertilizer Ass'n v. Bradley, 1937, 301 U.S. 178, 57 S.Ct. 748, 81 L.Ed. 990; Jacob Ruppert v. Caffey, 1920, 251 U. S. 264, 40 S.Ct. 141, 64 L.Ed. 260; Hadacheck v. Sebastian, Chief of Police of Los Angeles, 1915, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, Ann.Cas.1917B, 927; Mugler v. Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205. In each of these cases the fact that the statutes involved affected materials lawfully in existence prior to the effectiveness of the statutes was held not to render them invalid as arbitrary, and this notwithstanding that the materials thus affected were thereby impaired in value. In this connection it is to be noted that in the instant case it is not even alleged that the whiskey will sell less freely or at a less price if labeled straight bourbon whiskey than it would if it could be labeled straight corn whiskey. It is true that to be valid exercise of the police power must be reasonable, not arbitrary. But in the instant case the appellants raise no question as to the reasonableness of the amendatory regulations of February 28, 1938, in their change of the definition of corn whiskey.

Affirmed.