**DISTRICT OF COLUMBIA,**
**et al., Appellants**

v.

**BERETTA U.S.A. CORPORATION,**
**et al., Appellees.**

Nos. 06–CV–721, 06–CV–757.

District of Columbia Court of Appeals.

Argued Nov. 20, 2007.
Decided Jan. 10, 2008.

Paul R.Q. Wolfson, with whom A. Stephen Hut, Jr., David S. Molot, Karen C. Daly, Rachel Z. Stutz, Ryan P. Phair, Katherine Race Brin, Dennis A. Henigan, Brian J. Siebel, Daniel R. Vice, Roderick V.O. Boggs, Susan E. Huhta, Robert S. Peck, Ned Miltenberg, and Andre Mura, Washington, DC, were on the brief, for the individual appellants.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Linda Singer, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, were on the brief, for appellant the District of Columbia.

Bert H. Deixler, Los Angeles, CA and Mark J. Biros, Washington, DC, filed a brief amicus curiae on behalf of the appellants.

Michael L. Rice, with whom Thomas E. Fennell, Dallas, TX, Paul R. Reichert, Tashena Middleton Moore, Washington, DC, Lawrence S. Greenwald, Lawrence P. Fletcher–Hill, Catherine A. Bledsoe, Baltimore, MD, James P. Dorr, Chicago, IL, Sarah L. Olson, Paul F. Strain, M. King Hill, III, Baltimore, MD, John F. Renzulli, New York City, Scott C. Allen, Thomas V. McCarron, Baltimore, MD, Timothy A. Bumann, Atlanta, GA, and Robert E. Scott, Jr., Baltimore, MD, were on the brief, for appellees.

Isaac J. Lidsky, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Peter D. Keisler, As-

sistant Attorney General, Jonathan F. Cohn, Deputy Attorney General, and Mark B. Stern and Michael S. Raab, Attorneys, Appellate Staff, were on the brief, for intervenor-appellee United States of America.

Before FARRELL, REID, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

This appeal presents two primary issues: Does the Protection of Lawful Commerce in Arms Act ("the PLCAA"), 15 U.S.C. §§ 7901 *et seq.* (2005), by its terms require dismissal of the plaintiff/appellants' suit under the District of Columbia's Assault Weapons Manufacturing Strict Liability Act of 1990, D.C.Code § 7–2551.01 *et seq.* (2001) ("the SLA"); and, if so, does the PLCAA as applied to the plaintiffs' pending claims under the SLA violate separation of powers principles or due process principles embodied in the Fifth Amendment, or constitute a "taking" under the Fifth Amendment for which "just compensation" must be paid. We answer the first question yes, the second question no, and affirm the dismissal of the plaintiffs' suit.

**I.**

This litigation began when the individual plaintiffs and the District of Columbia (hereafter collectively "the plaintiffs") sued the defendants, various gun manufacturers, importers, or distributors of firearms, alleging negligence, creation of a public nuisance, and liability under the SLA.[1] This court in *District of Columbia v. Beretta,* 872 A.2d 633 (D.C.2005) (en banc) (*Beretta I*), upheld the trial court's dis-

missal of the negligence and public nuisance claims but reversed the dismissal of the SLA claim, allowing the individual plaintiffs to "advance to discovery on strict liability notwithstanding the difficulties of proof they may confront," and similarly permitting the District government to proceed on that claim "to the extent ... that it seeks subrogated damages as to named individual plaintiffs for whom it has incurred medical expenses." *Id.* at 637.

Subsequently, however, Congress enacted the PLCAA, key purposes of which (as stated in 15 U.S.C. § 7901(b)), were to:

(1) ... prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended. ... [and]

\* \* \* \*

(4) ... prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

The PLCAA provides that a "qualified civil liability action may not be brought in any Federal or State court," *id.* § 7902(a), and that a "qualified civil liability action that is pending on October 26, 2005 [the date of enactment], shall be immediately dismissed by the court in which the action was brought or is currently pending." *Id.* § 7902(b). A "qualified civil liability action" is defined as:

a civil action or proceeding or an administrative proceeding brought by any per-

---

1. The SLA provides, in relevant part:
 Any manufacturer, importer, or dealer of an assault weapon or machine gun shall be held strictly liable in tort, without regard to fault or proof of defect, for all direct and consequential damages that arise from bod-

ily injury or death if the bodily injury or death proximately results from the discharge of the assault weapon or machine gun in the District of Columbia.
D.C.Code § 7–2551.02.

son against a manufacturer or seller of a qualified product,[2] or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . .

However, not every civil action against a manufacturer or seller of firearms is barred by the PLCAA. Specifically, as relevant here, a qualified civil liability action "shall not include":

\* \* \* \*

(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18.

*Id.* § 7903(5)(A)(iii). The parties here, and other courts construing this language, have referred to subsection (5)(A)(iii) as the "predicate exception" to the PLCAA because, to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation. We will identify it that way also.

Following enactment of the PLCAA, the defendants here moved to dismiss the SLA claim, and on May 22, 2006, Judge Brook Hedge granted the motion in a memorandum opinion and order. She concluded, first, that because the SLA "is a state statute [3] that applies specifically and exclusively to the firearms industry," causes of action under the SLA would, "under a literal interpretation of the predicate exception, . . . seem to be excluded from the PLCAA's definition of a 'qualified civil liability action.'" Nevertheless, the judge applied principles of statutory construction to consider whether, "[w]hen taken as a whole and in the context of the purpose of the PLCAA, . . . the predicate exception was meant to include any state statute that applies to a result of the sale or manufacture of firearms, or [instead] whether it was meant to include only those state statutes that apply to the *manner* in which firearms are marketed or sold" (emphasis in original). Performing this inquiry, in particular after applying the doctrine of *ejusdem generis* ("where specific words follow general words, the application of the general term is restricted to things . . .

---

**2.** A "qualified product" is defined as "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

**3.** The PLCAA defines the District of Columbia as a "State" for purposes of the statutory exception and other provisions of the statute.

similar to those specifically enumerated," citing 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.17 (5th ed. 1992)), the court reasoned that "the specific cases given as examples in the predicate exception are clearly those involving violations of statutes regulating the *manner* in which firearms are sold or marketed," and that, accordingly, "the state statutes ... mentioned in the general part of the predicate exception are limited to [those] regulating the manner in which firearms are sold or marketed, and not statutes that are merely capable of being applied to the result of the sale or marketing of firearms." Any other interpretation, the judge believed, would "lead [ ] to a result ... plainly at variance with the [PLCAA] as a whole." Thus, because the SLA by its terms is not a statute regulating how—the manner in which—firearms are marketed, it "imposes the type of liability ... Congress has attempted to prohibit by ... the PLCAA," and the plaintiffs had failed to bring their cause of action within the predicate exception.

The judge further rejected the plaintiffs' arguments for unconstitutionality of the PLCAA as applied. First, although the PLCAA directs the "immediate [ ] dismiss[al]" by courts of any "qualified civil liability action" still pending, it does not violate the separation of powers and specifically "the rule stated in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871)," because the statute "works to provide a new legal standard for courts to apply"—it "defines a new class of civil actions"—and, rather than dictating the judgment in a case, leaves to the courts the "determination as to whether particular cases satisfy that new legal standard or

its exceptions." Nor does the statute deprive claimants whose cause of action has accrued under the SLA of due process of law, the judge ruled, because "[a] typical tort cause of action, whether based in statute or in the common law, ... 'is inchoate and affords no definite or enforceable property right until reduced to final judgment' " (citation omitted); and it therefore may be limited or eliminated by legislation such as the PLCAA that is "rationally related to a legitimate governmental purpose." Finally, for essentially the same reason, the judge ruled that the plaintiffs' cause of action under the SLA is not a "vested property right" subject to the Takings Clause of the Fifth Amendment.

## II. Statutory Interpretation

 We consider first the plaintiffs' argument that their cause of action under the SLA fits within the predicate exception of the PLCAA, an issue of statutory construction that we decide *de novo*. See *Chamberlain v. American Honda Finance Corp.*, 931 A.2d 1018, 1022–23 (D.C.2007). As the plaintiffs concede, if their action is not one alleging "violat[ion by the defendants of] a ... statute applicable to the sale or marketing of" a firearm, 15 U.S.C. § 7903(5)(A)(iii), then it is a "qualified civil liability action" that must be dismissed, unless the Constitution dictates otherwise.[4]

The plaintiffs contend they have met the predicate exception because their complaint alleges that the defendants "knowingly violated" the SLA, a statute that by its express terms "appli[es] to the sale or marketing of" a class of firearms. Our difficulty with this position begins, however, with determining just how the defen-

---

4. Dismissal in this event would be required whether the matter is viewed as one of federal pre-emption or, instead, as an instance of the rule that "a congressional statute of national application prevails over a statute applying

only to the District of Columbia." *In re Estate of Couse*, 850 A.2d 304, 305 n. 1 (D.C. 2004) (quoting *District of Columbia v. Wolverton*, 112 U.S.App.D.C. 23, 24 n. 3, 298 F.2d 684, 685 n. 3 (1961)).

dants may be said to have "violated" the SLA. In ordinary language, a "violation" is understood to mean "an infringement or transgression," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2554 (2002 ed.), and a violation of a law to mean "[a]n infraction or breach of the law." BLACK'S LAW DICTIONARY 1600 (8th ed. 2004). Plain meaning, therefore, would seem to require the law in question to contain a prohibition against, or standards of, conduct that are being violated. Indeed, the PLCAA illustrates statutory "violations" in *this* sense that it has in mind by exempting from its reach actions in which, for example, the manufacturer or seller is shown to have "knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to [firearms]," § 7903(5)(A)(iii)(I), or to have "conspired with any other person to sell" a firearm knowing that the actual buyer "was prohibited from possessing or receiving a firearm" under federal law. Section 7903(5)(A)(iii)(II). Significantly, too, District of Columbia law provides a statutory cause of action for damages against firearms manufacturers or sellers who "violate [ ] a . . . statute" in the commonly understood sense of those words. *See* D.C.Code § 7–2531.02(a) (2001). While otherwise generally mirroring the SLA, it requires proof that the defendant "knowingly and willfully engaged in *the illegal* sale" of a firearm, *id.* (emphasis added), defined to mean any of four actions including "[f]ailure to establish proof of the purchaser's residence in a jurisdiction where the purchase of the weapon is legal," *id.* § 7–2531.01(4)(A), or "[f]ailure to maintain full, complete, and accurate records of firearm sales as required by local, state, and federal law." *Id.* § 7–2531.01(4)(c).

The plaintiffs, however, have not alleged liability under D.C.Code § 7–2531.02, nor is their SLA claim that the defendants knowingly violated any proscriptions or requirements of local or federal law governing the sale or possession of firearms. Instead their argument is that the SLA, which by its terms would make these defendants "strictly liable in tort" for death or injuries resulting from the discharge of an assault weapon or machine gun they manufactured or sold, embodies "a legal duty owed to the residents of the District" and that its requirement to compensate for injuries "thus presupposes a 'violation' of a statutory duty." Br. for Individual Plaintiffs at 4–5 (citing BLACK'S LAW DICTIONARY as defining "violation" broadly to include "contravention of a right or duty").

Imaginative though this argument is, we think it stretches the meaning of "violation" well beyond what the authors of the PLCAA reasonably intended. The SLA imposes no duty on firearms manufacturers or sellers to operate in any particular manner or according to any standards of care or reasonableness. *Cf., e.g., City of Gary ex rel. King v. Smith & Wesson Corp.,* 801 N.E.2d 1222 (Ind.2003) (construing Indiana's public nuisance statute as embracing claim that gun manufacturers engaged in *unreasonable* distribution practices). The statute is "violated," in the plaintiffs' view, merely when a person is killed or injured by the discharge of an assault weapon manufactured or sold by a named defendant—an injury that may occur years after the manufacture or sale and despite the utmost care taken in the manufacture or sale. The SLA, in short, imposes a duty to pay compensation—neither more nor less [5]—and normal princi-

---

**5.** The plaintiffs acknowledge that the closest analogy to the cause of action the SLA creates is the common law doctrine of "abnormally dangerous activities," which makes a party engaging in such activity a virtual insurer against resulting injury. *See* RESTATEMENT

ples of statutory construction make it impossible for us to conclude that Congress intended to exempt an action founded on so attenuated a connection between a statutory "violation" and an injury from the reach of those civil actions the PLCAA proscribes.

For one thing, as we have implied, the literal meaning of the predicate exception—*i.e.*, its operative requirement of a "violat[ion of] a . . . statute"—connotes in ordinary speech something very different from a duty to compensate without having transgressed upon or breached any standard of conduct or care separately imposed. But even assuming some ambiguity in Congress's choice of a verb, we have also seen that the statute gives specific indication, in the succeeding paragraphs, of the class of statutory violations Congress had in mind, and none of these can reasonably be compared to a "violation" consisting of no more—nor less—than a duty to insure against injuries resulting from the discharge of a firearm. *See generally* 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.17 (5th ed. 1992) (where specific words follow general words, application of the general term is normally restricted to things similar to those specifically enumerated). Furthermore, the predicate exception requires proof that, despite the misuse of the firearm by a third person, "the [statutory] violation was a proximate cause of the harm for which relief is sought,"

§ 7903(5)(A)(iii), and it is quite implausible, we think, that Congress meant by this no greater showing than of a causal link between the "injury or death . . . [and] the *discharge* of the assault weapon or machine gun in the District of Columbia." D.C.Code § 7–2551.02 (emphasis added).

■ Finally, individual words of a statute "are to be read in the light of the statute taken as a whole," *Columbia Plaza Tenants' Ass'n v. Columbia Plaza Ltd. P'ship,* 869 A.2d 329, 332 (D.C.2005), and where possible, courts should avoid constructions "at variance with the policy of the legislation as a whole." *Jeffrey v. United States,* 892 A.2d 1122, 1128 (D.C. 2006). Congress was explicit in stating the "policy," *i.e.*, the purposes underlying the PLCAA. Key among these were an intent "[t]o prohibit causes of action against manufacturers, distributors, dealers and importers of firearms . . . for the harm solely caused by the criminal or unlawful misuse of firearms products . . . by others when the product functioned as designed and intended," 15 U.S.C. § 7901(b)(1), and "[t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." *Id.* § 7901(b)(4). *See Ileto v. Glock, Inc.,* 421 F.Supp.2d 1274, 1289 (C.D.Cal.2006) ("[T]he clear purpose of the PLCAA was to shield firearms manufacturers and dealers from liability for injuries caused by third parties using nondefective, legally obtained firearms.").[6]

(SECOND) OF THE LAW, TORTS § 519 cmt. d, at 35 (1977) (liability imposed by this doctrine is "the responsibility of relieving against [the] harm [caused by such activity] when it does in fact occur").

6. One congressional "finding" that underlay these purposes was a concern with liability actions "without foundation in hundreds of years of the common law" and that "do not represent a bona fide expansion of the common law." 15 U.S.C. § 7901(a)(7). From these words the plaintiffs infer that Congress

was substantially less troubled by the existence of *statutory* liability actions reflecting judgments "by the legislatures of the several States." *Id.* No such distinction, though, is reflected either in the definition of a "qualified civil liability action" or in the enumerated actions excluded therefrom, including the predicate exception; and to posit one all the same would ignore Congress's objection to "[l]awsuits" as a class (unless excepted) that "seek money damages and other relief [against manufacturers and sellers] for the

Shoehorning, as it were, into the predicate exception a strict liability cause of action that, at bottom, simply shifts the cost of injuries resulting from the discharge of lawfully manufactured and distributed firearms would, in our view, "frustrate Congress's clear intention," *Hubbard v. United States,* 514 U.S. 695, 703, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), reflected in the PLCAA.

By the terms of the PLCAA, the plaintiffs' action under the SLA was properly dismissed.

## III. Constitutional Issues

The plaintiffs next argue that the PLCAA, read to divest them of their pending cause of action under the SLA, (a) violates principles of separation of powers, (b) deprives them of a "vested right" contrary to due process principles embodied in the Fifth Amendment, and (c) amounts to an unconstitutional taking of their property. We consider these arguments in succession, again conducting *de novo* review. *See In re Warner,* 905 A.2d 233, 238 (D.C.2006).

### A. Separation of Powers

█ Relying on *United States v. Klein,* 13 Wall. 128, 80 U.S. 128, 20 L.Ed. 519 (1871), the plaintiffs argue that if the PLCAA requires dismissal of their action, it violates the separation of powers by "prescrib[ing] a rule for the decision of a cause in a particular way," *id.* at 146, thereby usurping a judicial function.[7] We are not persuaded.

In *Klein,* the administrator of the estate of a Confederate sympathizer sought to recover the value of property seized by federal agents during the Civil War. *See id.* at 136. The administrator prevailed in the Court of Claims, based on legislation that authorized recovery upon proof that the property owner had not given aid or comfort to the rebellion. *See id.* at 139, 143. The Supreme Court had previously held that a presidential pardon was enough to prove loyalty under this provision. *See id.* at 145. While *Klein* was pending in the Supreme Court, however, Congress passed a statute providing that a pardon was inadmissible as evidence of loyalty (indeed would constitute evidence of disloyalty), and further requiring the Court of Claims and the Supreme Court to dismiss for lack of jurisdiction any pending claims based on a pardon. *See id.* at 143, 145. The Supreme Court held this to be an impermissible attempt by Congress to "prescribe rules of decision to the Judicial Department of the government in cases pending before it." *Id.* at 146.

"Whatever the precise scope of *Klein,* however, later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'" *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (quoting *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 441, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992)). *Robertson* itself demonstrated this critical distinction. There Congress passed a law responding

harm caused by the misuse of firearms by third parties, including criminals." *Id.* § 7901(a)(3).

7. The United States asserts, at the threshold, that because *Klein* is premised on separation of powers principles it has no application to "Congress's regulation of non-Article III courts like those of the District of Columbia" (Br. for United States at 11). The plaintiffs

respond that "[n]othing in *Klein* suggests that [its] rule does not apply to all independent judicial bodies, including the District of Columbia courts, which indisputably enjoy the same autonomy from improper legislative directives that Article III grants to federal courts" (Reply Br. for Indiv. Plaintiffs at 11–12 n. 10). Our resolution of this issue enables us to stay clear of that interpretive thicket.

to litigation that challenged the government's efforts to allow logging in forests that were home to the endangered northern spotted owl. Existing law, under which the pending lawsuits had been brought, broadly made it "unlawful to 'kill' or 'take' any 'migratory bird.'" *See* 503 U.S at 437, 112 S.Ct. 1407. The new law Congress passed (the Northwest Timber Compromise) designated specific areas in which logging would be prohibited, but also provided that harvesting in accordance with these restrictions—*i.e.*, "management"—would meet "the statutory requirements that [were] the basis for the" existing lawsuits. *Id.* at 433–34, 437–38, 112 S.Ct. 1407. A lower court held that the Compromise effectively "direct[ed] the court to reach a specific result and make certain factual findings under existing law in connection with two [pending] cases," thereby violating *Klein's* bar against Congress "directing ... a particular decision in a case." *Id.* at 436, 112 S.Ct. 1407 (quoting *Seattle Audubon Soc'y v. Robertson*, 914 F.2d 1311, 1315–16 (9th Cir. 1990)). The Supreme Court reversed and ruled *Klein* inapplicable.

The new law "compelled changes in law," the Court said, "not findings or results under old law." *Id.* at 438, 112 S.Ct. 1407. By substituting new standards or limitations on harvesting, it "modified the old provisions" and, importantly, did not "purport [ ] to direct any particular findings of fact or applications of law, old or new, to fact." *Id.* What Congress directed by the Compromise, in short, "was a change in law, not specific results under old law," *id.* at 439, 112 S.Ct. 1407, and "[t]o the extent [it] affected the adjudication of the [existing] cases, it did so by effectively modifying the provisions at issue in those cases," *id.* at 440, 112 S.Ct. 1407, leaving the courts the task to apply and make proper findings under them.

*Plaut* and *Robertson* demonstrate why *Klein* does not apply to this case. The PLCAA sets forth new standards that must be met before a case may be brought or a pending one may proceed against the manufacturer or seller of a firearm for damages resulting from the use of the firearm by a third person. When, but only when, a suit is found by a court not to meet one of the statutory exceptions to a "qualified civil liability action," it must be dismissed. As Judge Hedge correctly reasoned, "nothing within the statute controls a court's determination as to whether particular cases satisfy [the] new legal standard or its exceptions." In the words of *Robertson*, the statute "direct[s no] particular findings of fact or application of law ... to fact"; rather, in the Supreme Court's more recent words, instead of "prescribing a rule of decision, [it] simply imposes the consequences of the court's application of the new legal standard," *Miller v. French*, 530 U.S. 327, 349, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000), a quintessential judicial task. *See also, e.g., Axel Johnson, Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 82 (2d Cir.1993) (statute that "leaves to the courts the task of determining whether a claim falls within the ambit of the statute" raises no issue under *Klein*). The statute thus raises no separation of powers issue.

## B. Due Process

■ The plaintiffs contend that their accrued cause of action under the SLA amounts to a property right that Congress could not abridge by retroactive application of the PLCAA. As the District of Columbia puts it (Br. for District at 17), "an accrued cause of action is a vested property right ... that ... cannot be divested by statute, including a statute applied retroactively." Moreover, they argue that a decision binding on this panel, *Barrick v. District of Columbia*, 173 A.2d

372 (D.C.1961), *aff'd sub nom. Swenson v. Barrick*, 112 U.S.App.D.C. 342, 302 F.2d 927 (1962), held exactly that, in ruling that due process barred Congress from retroactively divesting plaintiffs of an accrued cause of action for negligence under District of Columbia law. While the plaintiffs' arguments are not fanciful, they do not persuade us that Congress violated due process by making the PLCAA apply to pending cases.

■■■■ Laws enacted by Congress under its power to regulate interstate commerce, and thus meant to "adjust [ ] the burdens and benefits of economic life[,] come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). This

> strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). In other words, "the *constitutional* impediments to retroactive civil legislation are now modest," reflecting the fact that "[i]n this century, legislation has come to supply the dominant means of legal ordering, and circumspection has given way to greater deference to legislative judgments." *Landgraf v. USI Film Products*, 511 U.S. 244, 272, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (emphasis in original).

Among the "benign and legitimate purposes" retroactivity may serve is "simply to give comprehensive effect to a new law Congress considers salutary," where Congress has also determined "that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268, 114 S.Ct. 1483. Thus, even where retroactive application will impair "substantive rights" possessed before the enactment, *id.* at 278, 114 S.Ct. 1483, a court "in many situations" will be required to "apply the law in effect at the time it renders its decision," *id.* at 273, 114 S.Ct. 1483 (citation and quotation marks omitted), provided that Congress has made its intention to impose this requirement clear.

Undeniably, Congress meant the PLCAA to apply to pending "qualified civil liability actions." Nor have the plaintiffs persuasively argued that Congress acted arbitrarily or irrationally, *see Usery, supra*, in giving "comprehensive effect" to the statute by applying it to pending actions. *Landgraf, supra.* Congress was especially concerned with "[l]awsuits [that] *have been commenced*" seeking "money damages and other relief" against manufacturers and sellers of firearms for harms caused by the misuse of their products by others, including criminals, 15 U.S.C. § 7901(a)(3) (emphasis added), and with the threat to interstate commerce of thus "imposing liability on an entire industry for harm ... solely caused by others." *Id.* § 7901(a)(6). As the court stated in *Ileto, supra*, "[a]lthough one may disagree with Congress's predictions" about the effect on commerce of unchecked lawsuits of that kind, "one cannot credibly argue that the Act's retroactive provision does not further a legitimate legislative purpose." *Ileto*, 421 F.Supp.2d at 1302. At the same time, Congress did not, as the District government suggests (Reply Br. at 16), "totally abrogate" causes of action holding manu-

facturers or sellers liable for their actions causally linked to discharge of their firearms. As the defendants concede, the District's own statutory cause for "strict [ ] liab[ility] in tort" of a manufacturer or seller who engages in an "illegal sale," D.C.Code § 7–2531.02(a), illustrates the kind of actions left intact by the predicate exception. *See* 15 U.S.C. § 7903(5)(A)(iii). (Also, Congress left undisturbed actions "brought against a seller for negligent entrustment or negligence per se," *id.* § 7903(5)(A)(ii), as well as actions for "death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product." *Id.* § 7903(5)(A)(v).) Thus the PLCAA, extending as it does to all pending and future actions but exempting specified kinds of lawsuits from its reach, is reasonably viewed as an "adjust[ment of] the burdens and benefits of economic life" by Congress, *Usery, supra,* one it deemed necessary in exercising its power to regulate interstate commerce.

The plaintiffs argue, however, that all of this is essentially beside the point. They maintain that due process bars the retroactive application of the PLCAA to their action under the SLA because "a cause of action is a species of property protected by ... [d]ue [p]rocess," *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)—protected unqualifiedly, in their view, against retroactive abridgement. But *Logan,* in our judgment, imposes no such complete restriction on legislative authority. That case concerned an Illinois employment discrimination statute which provided that, within 120 days after a timely claim of unlawful discrimination had been filed with the state Fair Employment Practices Commission, the Commission was to convene a factfinding conference to explore the complaint informally. *See id.* at 424–25, 102 S.Ct. 1148. The petitioner in *Lo-*

*gan* had filed a timely complaint, but the Commission's representative inadvertently failed to schedule the informal conference within the 120–day period. The state Supreme Court, interpreting the 120–day time limit as jurisdictional, held that it barred consideration of the petitioner's claim even though the missed deadline was entirely "the Commission's error." *Id.* at 427, 102 S.Ct. 1148. The United States Supreme Court reversed, holding that as construed and applied by the state court, the 120–day limitation constituted "[a] system or procedure that deprives persons of their claims in a random manner." *Id.* at 434, 102 S.Ct. 1148. The claimant had "a [constitutionally] protected property interest," a "right to redress ... guaranteed by the State," *id.* at 431, 102 S.Ct. 1148, which could not be abridged in the arbitrary manner the state had employed without violating requirements of procedural due process laid down as early as *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and more recently in such cases as *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Yet, while re-affirming that government could not "random[ly]" deny "potential litigants use of established adjudicatory procedures," *Logan,* 455 U.S. at 429, 434, 102 S.Ct. 1148, the *Logan* Court was at pains to recognize the legislature's authority to make substantive changes affecting claims or causes of action. "[T]he State," it said, "remains free to create substantive defenses or immunities for use in adjudication— or to eliminate its statutorily created causes of action altogether." *Id.* at 432, 102 S.Ct. 1148. Doing so does not deprive parties with "a protected property interest" of that interest "without due process," because in such cases "the legislative de-

termination provides all the process that is due." *Id.* at 432–33, 102 S.Ct. 1148.

The plaintiffs read this language as saying nothing about a legislature's power retroactively to "create immunities ... or to eliminate statutorily created causes of action." But in a case (*Logan*) where the issue was precisely the manner by which the state had deprived the claimant of a "right to redress ... guaranteed" by law, it would be strange for the Court to have described the legitimate manner in which such "depriv[ation] ... of a protected property interest" may be accomplished if, even hypothetically, it could not apply to the cause of action in that case. *Logan*, 455 U.S. at 431–32, 102 S.Ct. 1148. At the least, *Logan* lends no support to the distinction that the plaintiffs urge between a claim that, because it has accrued, enjoys unqualified protection—*i.e.*, has "vested" indefeasibly—and all others which the legislature may limit or even "eliminate." *Id.* at 432, 102 S.Ct. 1148.

Rather, we think the correct constitutional distinction is one the Supreme Court has confirmed in the meantime and to which federal courts have almost uniformly adhered, namely, between causes of action that have reached final, unreviewable judgment—and in *that* sense have vested—and all others, pending and future, which may be modified by rationally grounded retroactive legislation. In *Plaut, supra*, the Supreme Court adverted to this distinction in striking down (as violative of the separation of powers) an amendment to the Securities Exchange Act of 1934 that required federal courts to reopen final judgments in private civil actions under § 10(b) of the Act. The Court said:

> When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly. *See United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801); *Landgraf*[,] ... 511 U.S. [at] 273–280, 114 S.Ct. 1483.... It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must "decide according to existing laws." *Schooner Peggy, supra*, 1 Cranch, at 109, 2 L.Ed. 49. Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.

514 U.S. at 226–27, 115 S.Ct. 1447 (emphasis in original). *See also Gavin v. Branstad*, 122 F.3d 1081, 1090–91 (8th Cir.1997) ("The doctrine of vested rights ... like the separation-of-powers doctrine expounded in *Plaut*, depends on the existence of a final judgment.... In essence, the vested rights doctrine is really only the due process analogue of the separation-of-powers doctrine that prevents Congress from reopening final judgments.")

Applying this distinction, federal appellate courts have repeatedly rejected claims, similar to the plaintiffs' here, that federal statutes modifying or abrogating pending state tort law actions violate due process by depriving litigants of their right to proceed. *See, e.g., Hammond v. United States*, 786 F.2d 8, 12–13 (1st Cir.1986) ("Because rights in tort do not vest until there is a final, unreviewable judgment, Congress abridged no vested rights by ... retroactively abolishing [plaintiff's] cause of action in tort"; while "Congress must comply with due process when abolishing or substantially modifying a common law

cause of action," citing *Logan, supra,* the enactment in question was not "arbitrary and irrational in purpose and effect" but rather "reasonably related to a legitimate congressional purpose"); *In re TMI,* 89 F.3d 1106, 1113–15 (3d Cir.1996); *Arbour v. Jenkins,* 903 F.2d 416, 420 (6th Cir. 1990); *Salmon v. Schwarz,* 948 F.2d 1131, 1142–43 (10th Cir.1991); *Sowell v. American Cyanamid Co.,* 888 F.2d 802, 805 (11th Cir.1989). *See also Deck v. Peter Romein's Sons, Inc.,* 109 F.3d 383, 386–88 (7th Cir.1997) (upholding, against due process challenge, amendment that limited recovery in pending survival and wrongful death claims under federal Migrant and Seasonal Agricultural Worker Protection Act to state workers' compensation benefits); *Gavin v. Branstad,* 122 F.3d at 1090–91 (upholding provision of Prison Litigation Reform Act that would require immediate termination of consent decree in pending constitutional challenge to prison conditions if relief was not "narrowly drawn"); *Austin v. City of Bisbee,* 855 F.2d 1429, 1434–37 (9th Cir.1988) (upholding statute that delayed application of Fair Labor Practices Act to municipalities and thus barred plaintiff's pending claims for overtime pay); *Adams v. Hinchman,* 332 U.S.App. D.C. 98, 102, 154 F.3d 420, 424–25 (1998) (upholding amendment that reduced recovery in pending claims for overtime pay under Fair Labor Standards Act from six years to two years back pay); *and see Hyundai Merchant Marine Co. v.*

*United States,* 888 F.Supp. 543, 551 (S.D.N.Y.1995) (upholding statute that barred claims based on content of navigational charts produced by the Defense Mapping Agency and so required dismissal of pending action for damages under Suits in Admiralty Act).

Joining these courts, we hold that while the plaintiffs' cause of action under the SLA "is a species of property protected by ... [d]ue [p]rocess," *Logan,* 455 U.S. at 428, 102 S.Ct. 1148, they received "all the process that is due," *id.* at 433, 102 S.Ct. 1148, when Congress barred pending actions such as theirs from proceeding as a rational means "to give comprehensive effect to a new law [that it] consider[ed] salutary." *Landgraf,* 511 U.S. at 268, 114 S.Ct. 1483.[8] Actions such as the plaintiffs' that are still pending and have not been reduced to judgment raise no concern with applying a "new provision [that] attaches new legal consequences to events *completed* before its enactment." *Id.* at 270, 114 S.Ct. 1483 (emphasis added). *See also General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (rejecting claim that state statute, reflecting legitimate legislative purpose furthered by rational means, "violated due process because its retroactive provisions unreasonably interfered with *closed transactions*" (emphasis added)); *Eastern Enters. v. Apfel,* 524 U.S. 498, 548, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring in the

---

8. Because, as explained earlier, Congress did not deprive injured persons of all potential remedies against manufacturers or sellers of firearms that discharge causing them injuries, we need not consider the plaintiffs' subsidiary claim that due process at least requires Congress to supply an alternative remedy before it may eliminate a cause of action retroactively. *But see, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 88, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("[I]t is not at all clear that the Due Process Clause in fact

requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy."); *Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.,* 990 F.2d 513, 518–19 (9th Cir.1993) (rejecting argument that, "by preempting any state law causes of action ... while failing to provide substitute federal causes of action, ERISA ... left a gap in the law" and violated due process: "[S]uch a gap is legitimate if it is the result intended by Congress.") (internal quotations omitted).

judgment and dissenting in part) ("If retroactive laws changed the legal consequences of transactions *long closed*, the change can destroy the reasonable certainty and security which are the very objects of property ownership.") (emphasis added). Pending causes of action, by definition, have reached nothing like that state of completion, and thus may properly yield to a legislative determination "to give comprehensive effect to a new law Congress considers salutary." *Landgraf*, 511 U.S. at 268, 114 S.Ct. 1483.

It remains for us to explain why *Barrick v. District of Columbia, supra,* does not stand in the way of this holding. *See generally M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). *Barrick* did, indeed, recite "[t]he general rule ... that 'retrospective laws are unconstitutional if they disturb or destroy existing or vested rights.'" 173 A.2d at 375, quoting 16 C.J.S. CONSTITUTIONAL LAW § 417, and citing, *inter alia,* 2 SUTHERLAND, STATUTORY CONSTRUCTION § 2205 (3d ed. 1943). And *Barrick* employed that rule to hold unconstitutional as applied an act of Congress that substituted the District of Columbia government for a District employee acting within the scope of his authority in any suit for negligence arising from the operation of a District motor vehicle, but supplanted the existing standard of negligence with a requirement that the plaintiff prove gross negligence if the vehicle was on an "emergency run." *See id.* at 374. After finding that Congress intended the new act "to apply retroactively as well as prospectively," the court held that "the Act in its application to the facts of this case results in an unconstitutional deprivation of [the plaintiff's] property right" that had "vested" well before the date of enactment. *Id.* at 375, 376.

The defendants argue that *Barrick*, although plainly based upon an understanding of "vested rights" contrary to the one we have joined here, is distinguishable because it dealt only with abrogation of a common law cause of action, unlike the statutory action created by the SLA. *Barrick* does provide support for that distinction. In stating that the plaintiff's "cause of action against the ambulance driver [*i.e.,* the District employee] was a property right," *id.* at 375, the court quoted in a footnote this passage from *Massa v. Nastri,* 125 Conn. 144, 3 A.2d 839, 840 (1939): "A right of action ... is a vested property interest ... at least 'where it comes into existence under common-law principles, and is not given by statute as a mere penalty or without equitable basis.'" Also, in acknowledging that "[w]hen ... a legislative intent [to make a statute retroactive] is clear, retroactivity by itself does not make a statute invalid," the court cited *Kahn v. Wall,* 68 A.2d 862 (D.C.1949), a prior binding decision that rejected a landlord-plaintiff's constitutional attack upon new rental housing legislation as applied to him, because the landlord's right "to obtain possession of his apartment was strictly statutory" and "[r]ights conferred by statute may be modified by subsequent legislation without violation of any constitutional provision." *Id.* at 864 (footnote omitted).[9]

We choose not to distinguish *Barrick* on this basis, however. The federal appellate

---

**9.** *See also De Ferranti v. Lyndmark,* 30 App. D.C. 417, 424 (1908) ("The proceedings requisite to the acquiring of a patent are closely analogous to the procedure in an action at law before reaching final judgment, where the right is one conferred by statute and entirely dependent upon the legislative will. In both instances they are mere matters of procedure that may be changed or abolished.... The bringing of a suit in such a case does not create a vested right. It is only the assertion of a right that may or may not mature into a vested right. No vested right is acquired by the bringing of such a suit, that is beyond legislative control, until judgment is rendered.").

decisions cited earlier, which we find persuasive, do not further distinguish among pending—*i.e.,* non-final—actions based on whether they were statutory or common-law based. And, to accord common-law actions greater privilege in this regard is difficult to reconcile with the Supreme Court's observation in *Duke Power Co., supra* note 8, at 88 n. 32, 98 S.Ct. 2620 (though not in the context of treating retroactivity), that "a person has no property, no vested interest, in any rule of the common law" and that the "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *Duke Power Co.,* 438 U.S. at 88 n. 32, 98 S.Ct. 2620 (citations and internal quotation marks omitted).

Instead, we conclude that this is a situation where the law simply has not "stood still" since *Barrick, see Elam v. Monarch Life Ins. Co.,* 598 A.2d 1167, 1170 (D.C. 1991), so much so that we would err in continuing to adhere to its holding. High Court decisions including *Usery, Pension Benefit Guar. Corp., Landgraf,* and *Plaut*

have refined the law of retroactivity in civil matters—subjecting retroactive civil legislation to "modest" constitutional limits, *Landgraf,* 511 U.S. at 272, 114 S.Ct. 1483, while otherwise leaving legislatures free to "readjust [economic] rights and burdens" so as even to "upset [ ] otherwise settled expectations," *Usery,* 428 U.S. at 16, 96 S.Ct. 2882, or impair "substantive rights," *Landgraf,* 511 U.S. at 278, 114 S.Ct. 1483—in a manner quite incompatible with the notion of unqualified, indefeasible vested rights adopted in *Barrick.*[10] A division of this court is not obliged "to follow, inflexibly, a [prior] ruling [of the court] whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions." *Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C. 1979); *see also Kleinbart v. United States,* 604 A.2d 861, 870 (D.C.1992) ("[w]hen intervening constitutional rulings necessitate a change in prior law, a division of this court is empowered to recognized that earlier decisions no longer have force."). For this reason, we decline to follow *Barrick's* holding or rationale and instead conclude

**10.** *Barrick,* for example, relied on the 1943 edition of Sutherland on Statutory Construction, but succeeding editions have recognized that "[i]t is impossible to discover the precise meaning of the term [vested rights] through which all of the decisions [employing it] can be consistently explained," 2 Norman J. Singer, Sutherland Statutory Construction § 41:6, at 423–27 (6th ed., rev. 2001), and that such rights may be abridged by retroactive amendment "if it is clear that the legislature intended the amendment to operate in such a fashion" provided that, as a species of "property," they are "protect[ed] from *arbitrary* interference." *Id.* at 428 (emphasis added).

We observe, moreover, that the statute at issue in *Barrick,* the District of Columbia Employee Non–Liability Act, 74 Stat. 519 (1960), was an exercise of Congress's authority to legislate exclusively for the District of Columbia, *see generally Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), and thus strictly presented no occa-

sion for this court to explore Congress's authority to regulate interstate commerce through retroactive legislation. Indeed, the court acknowledged that "vested rights sometimes may be reached by retrospective legislation that is enacted as a reasonable exercise of the police power," 173 A.2d at 375, citing *Speert v. Morgenthau,* 73 App. D.C. 70, 74, 116 F.2d 301, 305 (1940) (in turn referencing Congress's legitimate exercise of "the police power ... within the field of interstate commerce," and pointing out that, "[a]lthough as a general rule vested rights cannot be impaired by retrospective legislation, this is not true in respect of regulation under the police power"). *Barrick* may thus have relatively little to say about how the same court would have treated retroactive application of a statute by Congress designed to regulate an aspect of "the burdens and benefits of economic life" generally under the commerce clause. *Usery,* 428 U.S. at 15, 96 S.Ct. 2882.

that application of the PLCAA to the plaintiffs' pending cause of action under the SLA does not violate due process.

## C. Takings

 The plaintiffs contend, finally, that elimination of their cause of action by the PLCAA constitutes a "taking" for which the Fifth Amendment requires that they receive "just compensation." That compensation, they say, would be either the damages they can prove in a hypothetical suit against the defendants or, as they urged at oral argument, an order enjoining application of the PLCAA to their action.

 "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden," *Eastern Enters.*, 524 U.S. at 523, 118 S.Ct. 2131 (plurality opinion), a burden made even more demanding here because we have found no due process violation in the application of the PLCAA to pending actions. *See Concrete Pipe & Prods. of Calif. Inc. v. Constr. Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 641, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (citation and internal quotation marks omitted) ("Given that [petitioner's] due process arguments are unavailing, it would be surprising indeed to discover [that] the challenged statute nonetheless violated the Takings Clause."). And still another obstacle the plaintiffs face is that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (internal citations omitted)—something Congress intended in enacting the PLCAA.

 "There is no set formula to determine where [government] regulation"—as distinct from the "paradigmatic taking" of "direct government appropriation or physical invasion of private property," *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005)—"ends and taking begins." *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). The plaintiffs argue that taking "has begun" here because (a) they concededly possessed a protectible "property" interest in their cause of action, one that "presumably can be surrendered for value," *Logan*, 455 U.S. at 431, 102 S.Ct. 1148, and (b) Congress has flatly eliminated that cause of action if, as we have held, it does not fit within the predicate exception. But, as the Court observed in *Landgraf, supra*, the "Takings Clause prevents the Legislature ... from depriving private persons of *vested* property rights" without just compensation, 511 U.S. at 266, 114 S.Ct. 1483 (emphasis added), and so the determination of when that right in the form of a cause of action "vests" for due process purposes plainly has bearing on whether the plaintiffs' SLA action has been "taken" for constitutional purposes.

Among the federal courts cited earlier that have found no due process violation in Congress's abrogation of pending—but not final—causes of action, those that have addressed related taking claims have rejected them for essentially the same reasons. *See Grimesy v. Huff*, 876 F.2d 738, 743–44 (9th Cir.1989); *In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982, 988–89 (9th Cir.1987); *Ileto*, 421 F.Supp.2d at 1299–1300 (absence of "final, unreviewable judgment" means that retroactive application of PLCAA to plaintiffs' actions "does not constitute a taking"); *O'Brien v. Kislak Mortgage Corp.*, 934 F.Supp. 1348, 1362 n. 12 (S.D.Fla.1996); *In re ABC–NACO, Inc.*, 331 B.R. 773, 779–80 (Bankr.

N.D.Ill.2005). In *In re Jones Truck Lines, Inc.*, 57 F.3d 642 (8th Cir.1995), for example, the court rejected a claim that retroactive application of the Negotiated Rates Act to bar a carrier's pending claim against shippers for undercharges was an unconstitutional taking. "[A]ny economic impact based on the loss of causes of action is somewhat speculative," the court said (noting that "had the NRA not been enacted, shippers [might] have been able to defeat the [carrier's] claims" anyway), because "[c]auses of action" are inchoate and "not fully vested interests until reduced to final judgments," and thus "the projected economic impact on [the carrier] is not sufficiently concrete to establish a taking." 57 F.3d at 651.

In these decisions, the courts have applied key factors that inform taking analysis, including "the character of the action and ... the nature and extent of the interference," *Penn Central*, 438 U.S. at 130, 98 S.Ct. 2646, in particular whether government "has interfered with distinct investment-backed expectations" that are sufficient "to constitute 'property'" for taking purposes. *Id.* at 124–25, 98 S.Ct. 2646. Beyond the fact that the PLCAA involves no "physical invasion" of property but "instead merely affects property interests" through legislative altering of "the benefits and burdens of economic life to promote the common good," *Lingle*, 544 U.S. at 539, 125 S.Ct. 2074 (citation and internal quotation marks omitted), the "inchoate" or contingent nature of the plaintiffs' cause of action persuades us that it is not "sufficiently bound up with ... reasonable," "investment-backed expectations" to constitute property which the government has "taken." *Penn Central*, 438 U.S. at 124–

25, 98 S.Ct. 2646. The SLA does relax substantially traditional proof requirements for establishing tort liability, but still we recognized in *Beretta I* "the difficulties of proof" the plaintiffs "may [yet] confront" in tying their injuries to an individual named defendant. *Beretta I*, 872 A.2d at 637. Since even "settled expectations" may be disturbed by Congress without effecting a taking, *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Usery*, 428 U.S. at 16, 96 S.Ct. 2882), the expectancy the plaintiffs have of a successful outcome to their suit is not an interest the government is obliged to pay for as the price of eliminating it.

Moreover, while Congress unmistakably took away the specific cause of action the plaintiffs have alleged, that interference cannot be viewed "in a vacuum," *id.* at 225, 106 S.Ct. 1018, but must be considered in the context of what Congress both did and did not do. As we explained in rejecting the plaintiffs' due process challenge, Congress left intact means by which persons injured by firearms may yet pursue civil liability against sellers or manufacturers—recourse significant to measuring "the severity of the economic impact of the [PLCAA]." *Id.*[11] The plaintiffs will view this as small comfort to them since they chose, as was their right, to pursue another cause of action with substantially reduced proof requirements. Yet one need only read the factual averments of their complaint to see how narrow is the difference between the liability they alleged (and which they are now precluded from showing) and theories Congress left available to them—and to ask, accordingly, whether the difference is of constitutional

11. Congress, that is to say, has not worked the equivalent of a "total deprivation of beneficial use," *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), in regard to redress that persons injured by firearms may have against manufacturers or sellers.

magnitude. The complaint, as we pointed out in *Beretta I,* alleges myriad ways by which distributors and dealers of firearms unlawfully sell firearms (through, for example, "straw purchases" or "kitchen sales") and that the defendants, knowing or constructively knowing of these practices, have done nothing to prevent them and have thus "create[ed], maintain[ed], or suppl[ied] the unlawful flow of firearms into the District." *See Beretta I,* 872 A.2d at 638. These allegations fall only modestly short of a claim that the defendants were complicit in the illegal practices, *i.e.,* "aided [and] abetted" others in selling firearms in contravention of federal or state law. 15 U.S.C. § 7903(5)(A)(iii)(III). Of course, the plaintiffs did not, and were not required to, sue under D.C.Code § 7–2531.02 or an equivalent theory alleging complicity in such "illegal sale[s]," but the preservation of these causes of action marks an important limitation on Congress's interference with the interests of the plaintiffs (and others similarly situated) seeking redress from manufacturers or sellers for injuries from the discharge of firearms. That limitation reinforces our conclusion that regulation did not "end" and taking "begin," *Goldblatt,* 369 U.S. at 594, 82 S.Ct. 987, when Congress abolished qualified civil liability actions, including the plaintiffs'.

## IV.

For all of the above reasons, the judgment of the Superior Court is

*Affirmed.*