J-E02008-21

2022 PA Super 140

| | | |
|---|---|---|
| MARK AND LEAH GUSTAFSON, INDIVIDUALLY AND AS ADMINISTRATORS AND PERSONAL REPRESENTATIVES OF THE ESTATE OF JAMES ROBERT ("J.R.") GUSTAFSON | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | |
| SPRINGFIELD, INC. D/B/A SPRINGFIELD ARMORY AND SALOOM DEPARTMENT STORE AND SALOOM DEPT. STORE, LLC D/B/A SALOOM DEPARTMENT STORE; | : : : : : : | |
| Appellees | : : | |
| THE UNITED STATES OF AMERICA, | : : | |
| Intervenor | : | No. 207 WDA 2019 |

Appeal from the Order Entered January 15, 2019
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 1126 of 2018

BEFORE: PANELLA, P.J.; BENDER, P.J.E.; BOWES, J.; LAZARUS, J; OLSON, J.; DUBOW, J.; KUNSELMAN, J.; MURRAY, J.; and McCAFFERY, J.

PER CURIAM: **FILED: AUGUST 12, 2022**

The order of the trial court sustaining preliminary objections is reversed, and the case is remanded for further proceedings. Jurisdiction relinquished.

KUNSELMAN, J. files an opinion in support of the per curiam order to reverse in which PANELLA, P.J. and LAZARUS, J. join.

BENDER, P.J.E. files an opinion in support of the per curiam order to reverse.

DUBOW, J. files an opinion in support of the per curiam order to reverse.

OLSON, J. files a dissenting opinion in which BOWES and McCAFFERY, JJ. join, and MURRAY, J. concurs in the result.

MURRAY, J. files a dissenting opinion in which BOWES, OLSON and McCAFFERY, JJ. concur in the result.

2022 PA Super 140

| | | |
|---|---|---|
| MARK AND LEAH GUSTAFSON, INDIVIDUALLY AND AS ADMINISTRATORS AND PERSONAL REPRESENTATIVES OF THE ESTATE OF JAMES ROBERT ("J.R.") GUSTAFSON | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | |
| SPRINGFIELD, INC. D/B/A SPRINGFIELD ARMORY AND SALOOM DEPARTMENT STORE AND SALOOM DEPT. STORE, LLC D/B/A SALOOM DEPARTMENT STORE; | : : : : : : | |
| Appellees | : : | |
| THE UNITED STATES OF AMERICA, | : : | |
| Intervenor | : | No. 207 WDA 2019 |

Appeal from the Order Entered January 15, 2019
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s):  1126 of 2018

BEFORE:  PANELLA, P.J.; BENDER, P.J.E.; BOWES, J.; LAZARUS, J; OLSON, J.; DUBOW, J.; KUNSELMAN, J.; MURRAY, J.; and McCAFFERY, J.

OPINION IN SUPPORT OF PER CURIAM ORDER TO REVERSE BY KUNSELMAN, J.: **FILED: AUGUST 12, 2022**

In this appeal, the Court must decide whether the trial court erred by finding that a federal statute, the Protection of Lawful Commerce in Arms Act of 2005, 15 U.S.C. §§ 7901-7903 ("PLCAA"), bars a state, product-liablity lawsuit arising from the shooting death of Mark and Leah Gustafson's 13-year-old son, James Robert ("J.R.") Gustafson.  The Gustafsons claim PLCAA does

not apply to their product-defect claims or, alternatively, PLCAA is an unconstitutional infringement upon the sovereign police powers of the fifty states.

This Court is not deciding whether PLCAA represents good policy or is wise legislation. Nor does this Court consider whether this statute would be constitutional if the General Assembly of Pennsylvania adopts it. Finally, the Court today does not render any opinion regarding an individual's right to bear arms under the Second Amendment of the Constitution of the United States or Article I, § 21 of the Constitution of the Commonwealth of Pennsylvania.

Based on the reasons below, I vote to reverse the Order dismissing the Gustafsons' case and remand for the Defendants to file their Answer and New Matter.

**BACKGROUND**

On March 20, 2016, J.R. Gustafson and his 14-year-old friend visited the Westmoreland County home of Joshua Hudec.[1] J.R.'s friend obtained Mr. Hudec's semiautomatic handgun. **See** Gustafsons' Complaint at 5. The friend removed the handgun's magazine and therefore believed it "was unloaded, because . . . there were no adequate indicators or warnings to inform him that a live round remained in the chamber." **Id.** at 6.

---

[1] I take these facts from the Gustafsons' complaint, which we must accept as true for purposes of this appeal. **See Mazur v. Trinity Area Sch. Dist.**, 961 A.2d 96 (Pa. 2008). The complaint does not indicate what role, if any, Mr. Hudec played in these events.

"Thinking the handgun was unloaded, the boy pulled the trigger." ***Id.*** The chambered bullet fired and killed J.R. The district attorney charged J.R.'s friend with general homicide, and the friend eventually pleaded delinquent to involuntary manslaughter[2] in juvenile court.

Mark and Leah Gustafson, as Administrators of J.R.'s estate and in their own right as surviving kin, then sued the manufacturer and seller of the handgun (Springfield Armory, Inc. and Saloom Department Store, hereafter "Defendants").[3] The Gustafsons asserted that, under the common law of Pennsylvania, the Defendants were negligent and strictly liable for manufacturing and/or selling a defective handgun that caused their son's death. ***See id.*** at 13-25. They alleged a design defect, because the gun lacked a safety feature to disable it from firing without the magazine attached. They also alleged inadequate warnings on the handgun to alert the user that a bullet could remain in the chamber after removing the magazine.

---

[2] 18 Pa.C.S.A. § 2504(a).

[3] Springfield Armory, which made the handgun and has its principal place of business and incorporation in Illinois, did not contest the trial court's *in personam* jurisdiction. Saloom Department Store, the Pennsylvania corporation that sold the handgun, operates in Westmoreland County. The parties agree they are a "Manufacturer" and a "Seller" as Congress defined those terms in PLCAA.

Seeking to dismiss the action under the Pennsylvania Rules of Civil Procedure, the Defendants filed preliminary objections.[4] The Defendants asserted PLCAA immunized them from liablity, even if they tortiously contributed to J.R.'s death under Pennsylvania law. *See* Preliminary Objections at 5.

The Gustafsons responded that PLCAA does not apply to their suit. In the alternative, they argued the Act is unconstitutional. Upon learning of the Gustafsons' constitutional attacks against its statute, the United States of America ("the Federal Government") intervened to defend PLCAA. It claimed Congress properly enacted PLCAA under the Commerce Clause and the Bill of Rights.

The trial court concluded PLCAA barred the Gustafsons' suit, upheld the Act as constitutional, sustained the Defendants' preliminary objections, and dismissed the complaint. This timely appeal followed.

Initially, a panel of this Court, in a published opinion, unanimously reversed and declared PLCAA unconstitutional.[5] Upon the Defendants' request, this Court granted *en banc* review and withdrew the panel opinion.

---

[4] In Pennsylvania, a defendant may challenge the legal sufficiency of a claim by filing a preliminary objection in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(4). This is the state equivalent of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

[5] President Judge Emeritus Bender, Senior Judge Musmanno (retired), and the present author comprised the panel.

The Gustafsons raise two appellate issues:

1.    Does [PLCAA] bar [their] claims?

2.    Does the United States Constitution permit PLCAA to bar Pennsylvania courts from applying Pennsylvania law to provide [them] civil justice?

Gustafsons' Brief at 3.

Our scope and standard of review are the same for both issues. "When an appellate court rules on whether preliminary objections in the nature of a demurrer were properly sustained, the standard of review is *de novo*, and the scope of review is plenary." ***Mazur v. Trinity Area Sch. Dist.***, 961 A.2d 96, 101 (Pa. 2008). We affirm an order sustaining preliminary objections "only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief." ***Id.*** Also, this Court "must accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts." ***Id.***

## I.

First, I consider whether the language of PLCAA bars the Gustafsons' product-defect lawsuit. When interpreting a federal statute, if its terms are unambiguous, our analysis "begins, and pretty much ends, with the text." ***Lomax v. Ortiz-Marquez***, 590 U.S. ___, ___, 140 S. Ct. 1721, 1724 (2020).

### A.    Qualified-Civil-Liablity Action

PLCAA restricts certain suits from being filed against gun manufacturers and sellers. Under the Act, a "qualified-civil-liability action may not be brought

in any federal or state court."  15 U.S.C. § 7902(a).  If such an action is filed,

PLCAA dictates it "shall be immediately dismissed by the court in which the

action was brought or is currently pending."  15 U.S.C. § 7902(b).  Thus, if

the Gustafsons' lawsuit meets the definition of a "qualified-civil-liablity action,"

PLCAA requires dismissal.  The trial court ruled that this case met the definition

and, therefore, dismissed it.

A "qualified-civil-liability action" is any:

> civil action or proceeding or administrative proceeding
> against a manufacturer or seller of a [firearm or ammunition
> that moved through interstate commerce] for damages,
> punitive damages, injunctive or declaratory relief,
> abatement, restitution, fines, or penalties, or other relief,
> resulting from the criminal or unlawful misuse of [that
> firearm or ammunition] by the [plaintiff] or a third party
> . . . ."

15 U.S.C. § 7903(5)(A).

Applying that definition here, it is undisputed that the Gustafsons filed

a "civil action . . . against a manufacturer [and a] seller of a [firearm] for

damages . . . ."  15 U.S.C. § 7903(5)(A).  Moreover, the damages they seek

resulted, at least in part, from the criminal or unlawful misuse of that firearm

by a third party:  *i.e.*, the shooter.  Under PLCAA, the "term 'unlawful misuse'

means conduct that violates a statute, ordinance, or regulation as it relates to

the use of a [firearm or ammunition]."  15 U.S.C. § 7903(9).  Any unlawful

misuse will suffice, even unlawful possession of the gun itself.

For instance, in **Ryan v. Hughes-Ortiz**, 959 N.E.2d 1000 (Ma. App.

2012), a man was returning a Glock to his employer's display case, when the

handgun accidentally discharged and killed him. The administratrix of his estate sued Glock for defectively designing both the gun and the display case that had failed to stop the stray bullet. The plaintiff argued PLCAA did not apply, because the decedent had not "misused" the handgun in any way. 15 U.S.C. § 7903(5)(A). The appellate court disagreed. The court held that the decedent, who was a convicted felon, "misused" the gun merely by possessing it.[6] *See Ryan*, 959 N.E.2d at 1008. Thus, PLCAA applied and immunized Glock from any liability under Massachusetts law.

Like the shooter in **Ryan**, J.R.'s friend committed a state crime when he fired the gun. Thus, this case also involves "criminal or unlawful misuse" of a gun that meets the general definition of "qualified-civil-liablity action." 15 U.S.C. § 7903(5)(A). That general definition applies.

## B.    *Product-Defect Exception*

Although this case meets the general definition of "qualified-civil-liablity action," the Gustafsons claim it falls within one of PLCAA's six exceptions to that definition.

Those six exceptions are:

> (i)     an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

---

[6] 18 U.S.C. § 922(g)(1); *see also United States v. Tann*, 577 F.3d 533, 534 (3d Cir. 2009).

> (ii)     an action brought against a seller for negligent entrustment or negligence *per se*;
>
> (iii)    an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the [firearm or ammunition], and the violation was a proximate cause of the harm for which relief is sought . . . ;
>
> (iv)     an action for breach of contract or warranty in connection with the purchase of the product;
>
> (v)      an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the [firearm or ammunition], when used as intended or in a reasonably foreseeable manner, except that where the discharge of the [firearm or ammunition] was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or
>
> (vi)     an action or proceeding commenced by the Attorney General [of the United States] to enforce the provisions of chapter 44 of Title 18 or chapter 53 of Title 26 [of the United States Code].

*Id.*  If a lawsuit fits into one of these exceptions, PLCAA does not compel its dismissal.  The Gustafsons assert that their lawsuit comes within exception (v).  *See* Gustafson's Brief at 30.

Exception (v) seemingly allows product-defect lawsuits like this one to proceed if the firearm was "used as intended or in a reasonably foreseeable manner . . . ."  15 U.S.C. § 7903(5)(A)(v).  However, it contains a critical caveat.  If "the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole

proximate cause of any resulting death, personal injuries, or property damage." *Id.* That caveat renders exception (v) toothless, because *all* criminal offenses require a *volitional* act.[7] Whenever a defective gun causes harm and a crime is involved, exception (v) cannot apply.

This exact scenario occurred in *Adames v. Sheahan*, 909 N.E.2d 742 (Ill. 2009), *cert. denied* sub nom. *Adames v. Beretta U.S.A. Corp.*, 558 U.S. 1100 (2009). There, like here, a teenager found a handgun inside a home. The boy knew the gun was loaded when the magazine was connected, but he thought it was unloaded without it. He removed the magazine, pointed what he thought was an unloaded gun at his friend, jokingly pulled the trigger, and killed him. A juvenile court found the shooter delinquent of involuntary manslaughter and reckless discharge of a firearm. The victim's parents sued the gun manufacturer for product liability (design defect and failure to warn about a bullet concealed in the chamber). While the case was proceeding, Congress passed PLCAA.

The Supreme Court of Illinois held the general rule of PLCAA applied and dismissed the parents' product-defect lawsuit. It reasoned that the shooter

---

[7] This is basic criminal law. For example, in Pennsylvania, "A person is not guilty of an offense unless his liability is based on conduct which includes a *voluntary* act or the omission to perform an act of which he is physically capable." 18 Pa.C.S.A. § 301(a) (emphasis added). Courts may "not impose criminal liability on a person for an involuntary act." *Commonwealth v. Lamonda*, 52 A.3d 365, 369 (Pa. Super. 2012). *See also Voisine v. United States*, 579 U.S. 686, 693 (2016) (distinguishing between a "volitional" act and "an involuntary motion" when interpreting a federal statute).

criminally misused the gun, because his actions were state crimes. The fact that the shooter was a juvenile who did not intend the harm was immaterial. *See id.* Rejecting plaintiffs' reliance upon exception (v), the court found the caveat to that exception "requires only that the volitional act constitute a criminal offense. As discussed . . . shooting [the victim] constituted a criminal offense." *Id.* at 763. As *Ryan* demonstrates, the criminal act that triggers a "qualified-civil-liability action" under PLCAA will *always* be a volitional act that nullifies exception (v). Thus, the exception will never apply; I find the Gustafsons' argument fails.

### C. Canon of Statutory Construction of Constitutional Avoidance

Next, the Gustafsons urge us to construe PLCAA narrowly. They believe such an interpretation can avoid unconstitutional, federal encroachment into the States' police power – specifically, the law of torts. *See* Gustafsons' Brief at 7-8 (citing *Bond v. United States*, 572 U.S. 844 (2014); and *Gregory v. Ashcroft*, 501 U.S. 452 (1991)). The crux of the Gustafsons' theory is that, despite the plain language of the statute, Congress did not manifest an unmistakable desire to preempt this particular type of product-liability action. I disagree.

The trial court ruled that the statute cannot be read narrowly, because it found a clear Congressional intent to preempt state tort law. The trial court said the canon of statutory construction of constitutional avoidance applies:

> "where an otherwise acceptable construction of a statute would raise serious constitutional problems." *Edward J. DeBartolo Corp. v. FL Gulf Coast Bldg. & Const. Trades*

> ***Council***, 485 U.S. 568, 572 (1988). In such situations, "the Court will construe the statute to avoid such problems, unless such construction is plainly contrary to the intent of Congress." ***Id.***
>
> \*     \*     \*
>
> [T]he text of [PLCAA] makes manifest Congress's intent to preempt state tort law. Congress explicitly stated in PLCAA that it intended to "prohibit causes of action" as defined in PLCAA to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901. Throughout PLCAA, Congress unambiguously and without question states its intention to definitively preempt state tort law.

Trial Court Opinion, 1/15/19, at 3-4.

Like the trial court, I would conclude that Congress clearly manifested its intent to upend "the traditional constitutional balance of federal and state power." ***Gregory***, 501 U.S. at 464. Congress desired for PLCAA to supplant the sovereign police powers of the States to regulate their own laws of torts. Critically, the Gustafsons offer no narrower interpretation of PLCAA that would not revamp state tort law, because, as explained below, usurping state tort law was Congress's goal in passing PLCAA.

Hence, I agree with the trial court – the canon of statutory construction of constitutional avoidance does not apply to PLCAA. Federal overreach arises (and will continue to arise) in every PLCAA case.

The Gustafsons' arguments that PLCAA's statutory language does not apply to their lawsuit are meritless.

## II.

The Gustafsons' second issue challenges the constitutionality of PLCAA under the principles of federalism.[8]  Federalism divides sovereign authority between the Federal Government and the States, based on the "unique insight [of the Founders] that freedom is enhanced by the creation of two governments, not one." ***Alden v. Maine***, 527 U.S. 706, 758 (1999).

In that system of government, "there is no question that State and local authorities . . . enjoy the general power of governing, including all sovereign powers envisioned by the constitution and not specifically vested in the Federal Government." ***National Federation of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.***, 595 U.S. ___, ___, 142 S. Ct. 661, 667 (2022) (Gorsuch, J., concurring) (some punctuation omitted) ("***OSHA***").  "The Federal Government's powers, however, are not general but limited and divided." ***Id.*** (citing ***McCulloch v. Maryland***, 17 U.S. 316 (1819)).

In addressing a constitutional challenge under federalism, courts must determine "whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." ***New York v. United States***, 505 U.S. 144, 155 (1992).  As Justice O'Connor explained, this question may be approached in either of two ways:

---

[8] The Gustafsons also challenge PLCAA under the Fifth Amendment, which I decline to address given my decision on their other constitutional theories.

> In some cases, the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I . . . . In other cases, the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment . . . [T]he two inquiries are mirror images of each other.

*Id.* (citations omitted).

The Federal Government takes the first approach to rebut the instant Tenth Amendment challenge. It avers that PLCAA is authorized by one of the powers delegated to Congress in Article I. **See** Federal Government's Substituted Brief at 7. The Gustafsons take the second approach; they claim that PLCAA invades the province of state sovereignty reserved by the Tenth Amendment. I address each of their approaches in turn.

### A.  The Commerce Clause

When confronting a challenge to Congressional authority, the "Federal Government . . . must show that a constitutional grant of power authorizes each of its actions." ***National Federation of Indep. Bus. v. Sebelius***, 567 U.S. 519, 535 (2012) ("***Sebelius***"); ***see also OSHA***, ***supra*** (Gorsuch, J., concurring) (accord). Thus, if the Constitution does not explicitly provide Congress with authority to pass a bill, then Congress may not enact it.

The Federal Government claims that Congress had the authority to pass PLCAA under the Commerce Clause. **See** Federal Government's Substituted Brief at 8-11. That clause grants Congress power to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8 cl. 3. The Federal Government believes that "the possibility of suits against

gun manufacturers and sellers 'constitute[s] an unreasonable burden on interstate and foreign commerce.'" Federal Government's Substituted Brief at 8 (quoting 15 U.S.C. § 7901(a)(6)).

In reviewing that Commerce Clause theory, the trial court relied upon ***Ileto v. Glock, Inc.***, 565 F.3d 1126 (9th Cir. 2009), and found that the Commerce Clause permitted PLCAA's enactment. The trial court agreed with the Ninth Circuit "that it is entirely reasonable that PLCAA would have a direct and immediate effect on the regulation of interstate and foreign commerce." Trial Court's Opinion, 1/15/19, at 14. Therefore, the trial court concluded that it was "reasonable for Congress to find that limiting liability in certain situations would directly affect and bolster interstate trade in firearms . . . ." ***Id.*** at 14-15.

However, ***Ileto*** is not a Commerce Clause case. The plaintiffs in ***Ileto*** did not challenge (and the Ninth Circuit did not consider) Congress's authority to pass PLCAA under the Commerce Clause. Instead, ***Ileto*** involved a Fifth Amendment challenge to PLCAA's retroactivity provision. ***See Ileto***, 565 F.3d at 1141. The Ninth Circuit relied upon the regulation of commerce as Congress's rational basis for enacting PLCAA. Hence, that court did not actually consider whether the Act was a permissible exercise of Commerce Clause authority. Those are two entirely different issues.

Unlike ***Ileto***, the Gustafsons' challenge is not based on retroactivity under the Fifth Amendment. They bring a facial challenge that PLCAA falls outside Congress's enumerated powers. Thus, I believe ***Ileto*** neither

considered nor decided the issue at hand, and the trial court's reliance upon it was misplaced.

Instead, I turn to the Supreme Court's historical interpretation of the Commerce Clause. Chief Justice Marshall said, "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." ***Gibbons v. Ogden***, 22 U.S. 1, 189–90 (1824). This definition of commerce ensures the "authority of the Federal Government may not be pushed to such an extreme as to destroy the distinction, which the Commerce Clause itself establishes, between commerce 'among the several States' and the internal concerns of a State." ***N.L.R.B. v. Jones & Laughlin Steel Corp.***, 301 U.S. 1, 30 (1937). "That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system." ***Id.*** Congress may not rely upon the Commerce Clause to regulate purely local events.

The Commerce Clause has its limits. The High Court has recognized only three categories of activity that Congress may constitutionally regulate under the Commerce Clause:

> [1.] Congress may regulate the use of the channels of interstate commerce.
>
> [2.] Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.

> [3.] Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (citations omitted).

In PLCAA, Congress asserted that state lawsuits against members of the gun industry are local activities that burden interstate commerce. Therefore, Congress justified its enactment of PLCAA under the third category identified above.

Whether intrastate activities "affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question and can be settled finally only by [the courts]." *Id.* at 557 n.2. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.*

When a party challenges Congress's Commerce Clause authority, courts must "evaluate the legislative judgment that the activity in question substantially affected interstate commerce . . . ." *Id.* at 562–63. This raises a pure question of law. *See id.* To resolve it, courts may not "pile inference upon inference in a manner that would . . . convert Congressional Commerce Clause authority to a general police power of the sort held only by the States." *Id.* at 549–50.

As the Supreme Court of Pennsylvania observed over a century ago: "It is difficult to lay down a definite rule marking the division lines between

intrastate [activity] and interstate commerce . . . to determine with precision and exactness in each case as it arises whether the injured [person] was or was not engaged in interstate commerce . . . ." *Hench v. Pennsylvania R.R. Co.*, 91 A. 1056, 1058 (Pa. 1914). "To hold the scales evenly balanced, so as not to unduly limit the powers of Congress on one hand, nor yet encroach upon the proper exercise of state jurisdiction on the other, is not an easy task for any court." *Id.* "But there must be a division line at some point in each case, and the facts must be the guide to determine where that line shall be drawn." *Id.* Thus, our jurisprudence demonstrates that Congress may not draw the division lines of its own authority for itself. Otherwise, every federal statute would survive judicial review.

Here, the trial court did not analyze whether the intrastate activities that Congress sought to regulate under PLCAA substantially affect interstate commerce. Instead, it blindly accepted Congress's judgment of its own Commerce Clause authority. Merely because Congress titled this Act the Protection of Lawful *Commerce* in Arms Act does not mean it regulates "commerce," as a matter of constitutional law. *See*, *e.g.*, *Lopez*, *supra* at 557 n.2. The trial court's excessive deference licensed Congress to interpret the Constitution, in other words, "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Congress has no such power. *Id.*; U.S. Const. art. I, § 1.

Likewise, the Federal Government offers no justification to support the claim that state lawsuits against gun manufacturers and sellers substantially

affect interstate commerce. And it cites only one decision[9] analyzing PLCAA under the Commerce Clause – ***City of New York v. Beretta U.S.A. Corp.* et al.**, 524 F.3d 384 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009).

In ***City of New York***, the City, former-Mayor Michael Bloomberg, and others filed a lawsuit against several members of the gun industry in federal court. They sought an injunction under New York law based on public nuisance to abate harm resulting from alleged negligent marketing and distribution practices. While the suit was before the district court, Congress passed PLCAA, and the defendants moved for immediate dismissal. The City opposed the motion, claiming that exception (iii) to the definition of "qualified-civil-liability action" excluded the suit from PLCAA's scope. The City also attacked the Act's constitutionality.

---

[9] The Defendants and Federal Government cite six appellate cases upholding the constitutionality of PLCAA. Of those six cases, however, two addressed Fifth Amendment and separation of powers questions. ***Ileto v. Glock, Inc.***, 565 F.3d, 1126, 1138 (9th Cir. 2009), and ***District of Columbia v. Beretta U.S.A. Corp.***, 940 A.2d 163 (D.C. 2008). Of the others, three addressed Tenth Amendment concerns, but they simply adopted the analysis of ***City of New York v. Beretta U.S.A. Corp.* et al.**, 524 F.3d 384 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009), without independently analyzing PLCAA's constitutionality. ***See Adames v. Sheahan***, 909 N.E.2d 742 (Ill. 2009), *cert. denied* sub nom. ***Adames v. Beretta U.S.A. Corp.***, 558 U.S. 1100 (2009); ***Estate of Kim v. Cox***, 295 P.3d 380 (Ak. 2013); and ***Delana v. CED Sales***, 486 S.W.3d 316 (Mo. 2016). Thus, the only decision that truly analyzed the Commerce Clause and Tenth Amendment Claims was ***City of New York***. My review of that case encompasses the analyses of the other courts.

The district court refused to dismiss and certified an immediate appeal. In a split decision, the Second Circuit reversed. The panel majority concluded PLCAA applied and that the Act was a valid exercise of Commerce Clause power. Based upon this conclusion, the majority found that PLCAA does not violate the Tenth Amendment.[10]

On the Commerce Clause issue, the City contended PLCAA regulated intrastate activities which fell outside the three Commerce Clause categories. The City relied upon **Lopez**, **supra** (declaring a federal statute barring the possession of firearms in school zones unconstitutional, because Congress had regulated intrastate activity too-far removed from the stream of interstate commerce) and **United States v. Morrison**, 529 U.S. 598 (2000) (declaring part of the Violence Against Women Act, 34 U.S.C. § 12361, unconstitutional, because it criminalized intrastate activity).

The Second Circuit disagreed. It held that PLCAA falls within the third category of Commerce Clause regulation, due to the substantial economic effect that lawsuits may have on the gun industry. The court distinguished **Morrison** and **Lopez**, because it found a closer "connection between the regulated activity and interstate commerce under the [PLCAA]" than existed in the statutes in those cases. **City of New York**, 524 F.3d at 394.

_____

[10] The dissent did not address PLCAA's constitutionality. Instead, it wanted to certify the case to the Court of Appeals of New York for interpretation of the underlying New York statute.

According to the Second Circuit, PLCAA presents "no concerns about Congressional intrusion into truly local matters," because Congress only applied the statute to a firearm or ammunition "that has been shipped or transported in interstate or foreign commerce." ***Id.*** (emphasis removed) (some punctuation omitted). The court based this holding upon the facts that "there can be no question of the interstate character of the [gun] industry" and that "Congress rationally perceived a substantial effect on ***the industry*** . . . ." ***Id.*** (emphasis added). I find this reasoning unpersuasive considering more recent Supreme Court authority.

Seven years after ***City of New York***, when the Supreme Court of the United States decided ***National Federation of Indep. Bus. v. Sebelius***, 567 U.S. 519 (2012), it rejected the contention that a federal statute's substantial effect on an interstate industry equates to a regulation of local activity that substantially affects interstate commerce. In ***Sebelius***, the High Court reviewed the individual mandate[11] of the Affordable Care Act[12] (a.k.a., "Obamacare" or "the ACA").

The Federal Government defended the ACA's individual mandate under the Commerce Clause and Congress's taxation power.[13] It believed the mandate came "within Congress's [Commerce Clause] power, because the

---

[11] ***See*** 26 U.S.C. § 5000A(a).

[12] ***See*** 124 Stat. 119-1025.

[13] ***See*** U.S. Const. art. I, § 8, cl. 1.

- 20 -

failure to purchase insurance has a substantial and deleterious effect on interstate commerce by creating a cost-shifting problem." ***Id.*** at 548-49.

The ACA's goals were "to increase the number of Americans covered by health insurance and decrease the cost of health care." ***Id.*** at 538. No one questioned the health-insurance industry's interstate character or Congress's ability to regulate it. "We do not doubt that the buying and selling of health-insurance contracts is commerce generally subject to federal regulation." ***Id.*** at 650 (Scalia, J., dissenting).

However, Chief Justice Roberts explained that the Founders wrote the Commerce Clause under the presumption that "commerce" meant activity. He observed that courts have "always recognized that the power to regulate commerce, though broad indeed, has limits." ***Id.*** at 554 (quotation omitted). In declaring the ACA's individual mandate impermissible under the Commerce Clause, the Chief Justice opined that the mandate did not "regulate ***existing commercial activity***." ***Id.*** at 552 (emphasis added). Instead, it compelled individuals "to become active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." ***Id.***

Writing separately, Justice Scalia (joined by Justices Kennedy, Thomas, and Alito) agreed with the Chief Justice. According to Justice Scalia, "If Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power, or, in Hamilton's words, 'the hideous monster whose devouring jaws spare neither sex nor age, nor high nor low,

nor sacred nor profane.'" ***Id.*** at 652-53 (Scalia, J., dissenting) (quoting The Federalist No. 33, p. 202 (C. Rossiter ed. 1961)).

Because the ACA's individual mandate regulated people who were not active participants in the health-insurance market, five Justices held that the Commerce Clause could not sustain the mandate.[14] Congress had sought to command "those furthest removed from an interstate market to participate in the market . . . ." ***Id.*** It tried to force those who chose not to participate in the health-insurance market to serve as the industry's financial sureties by mandating that they contribute to the national cost of private health insurance. Thus, the ACA's individual mandate unconstitutionally shifted the costs of health insurance from the industry onto persons who had no existing commercial transactions with that industry.

Congress commits the same constitutional overreach in PLCAA. The Act regulates the inactivity of individuals who may ***never*** have engaged in a commercial transaction with the gun industry. As this case demonstrates, PLCAA reaches out and forces J.R. Gustafson and his parents to provide financial support for the gun industry by forgoing their tort claims against its members. It conscripts the Gustafsons to serve as financial sureties for the alleged-tortious acts and omissions of the industry by barring them from filing a lawsuit against its members under the common law of Pennsylvania.

---

[14] The Chief Justice rejected the Federal Government's Commerce Clause theory but accepted its alternative theory and upheld the individual mandate of the ACA under the taxation power. Justices Ginsburg, Breyer, Sotomayor and Kagan joined that part of his opinion.

Whereas the ACA required uninsured individuals to support the insurance industry on the front end by mandating that they buy health insurance, PLCAA requires the gun industry's tort victims to support that industry on the back end by allowing the industry to retain money it would otherwise owe as damages. PLCAA turns tort victims into indemnifiers of the gun industry.

Critically, neither J.R. nor his parents purchased the gun used to kill him, *i.e.*, they did not engage in commerce of *any* kind.[15] Hence, at the time of J.R.'s death, there was no *existing* commercial activity between the Gustafsons and the gun industry for Congress to regulate. Any relation

---

[15] In her Dissenting Opinion, Judge Olson attempts to distinguish *National Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012), based on her belief that the Gustafsons "chose *to* engage in commercial activity (*i.e.*, litigation) that Congress found substantially affect interstate commerce." Olson Dissent at 19 (emphasis in original). I cannot agree.

Judge Olson offers no analysis or authority to support her claim that litigation is commercial activity. This unprecedented proposition violates the definition of commerce promulgated by the Supreme Court of the United States. *See Gibbons v. Ogden*, 22 U.S. 1, 189-90 (1824). It is unfathomable how commerce — the free exchange of goods and services across state lines and intercourse between the parts of the nation — includes litigation — the "process of carrying on a lawsuit," *i.e.*, a "proceeding instituted for the purpose of enforcing a right or otherwise seeking justice." BLACK'S LAW DICTIONARY at 1075, 1663 (10th ed. 2014) (quoting GARNER'S DICTIONARY OF LEGAL USAGE at 862-63 (3d ed. 2011)). Litigation is not commerce.

And, like the trial court, the Olson Dissent ultimately defers to Congress's assertion that this state litigation substantially affects interstate commerce. It never demonstrates how the Gustafson's lawsuit "has such a close and substantial relation to interstate commerce that [its] control is essential or appropriate to protect that commerce from burdens and obstructions." *N.L.R.B. v. J&L Steel Corp.*, 301 U.S. 37 (1937).

between Mr. Hudec's gun and interstate commerce had clearly ended by the time he brought the gun into his home for personal use. By regulating events that are well-removed from the interstate marketplace and individuals who never participated in that marketplace, I conclude that Congress exceeded its Commerce Clause authority when it enacted PLCAA.

Similarly, the High Court determined that Congress exceeded its Commerce Clause authority when it enacted the Gun-Free School Zones Act of 1990. There, Congress attempted to criminalize the possession of a gun near a school. Congress asserted its federal jurisdiction on the grounds that guns near schools would negatively impact education, and therefore the quality of the future workforce, which would substantially affect interstate commerce. In *Lopez*, *supra*, the Supreme Court of the United States rejected Congress's assertion of federal jurisdiction.

There, a criminal defendant, who was convicted under the Gun-Free School Zones Act, challenged the statute's constitutionality. The High Court concluded that Congress could not pass the statute under the Commerce Clause, because there was "no indication that [Lopez], who merely possessed a gun near a school, had *recently* moved in interstate commerce . . . ." *Lopez*, 514 U.S. at 567 (emphasis added). Additionally, the statute did not require that Lopez's "possession of the firearm have any *concrete tie* to interstate commerce." *Id.* (emphasis added). Possessing a gun near a school was a local event, too-far removed from interstate commerce to affect that commerce in any substantial way.

PLCAA, like the Gun-Free School Zones Act, is unsustainable; it grants the gun industry immunity regardless of how far removed from interstate commerce the harm arises. As *Lopez* teaches, intrastate criminal misuse of firearms and ammunition (and, by extension, any tortious harm to which such intrastate misuse may contribute) are local events that are too-far removed from interstate commerce to come within Congressional regulation. Without a recent or concrete link between federal legislation and interstate commerce, Congress's reliance upon the Commerce Clause puts every local victim of a crime or tort within federal regulatory reach. However, local crimes (such as involuntary manslaughter) and the law of torts have never been a federal concern. Rather, they are part of the States' sovereign police powers to protect their citizens from harm.

Ignoring this simple truth, the Federal Government would instead have us "pile inference upon inference in a manner that would . . . require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567–68. Like the Supreme Court in *Lopez*, I am unwilling to find that Congress's Commerce Clause authority extends to an area of law too-far removed from interstate commerce. *See id.* at 568.

Notwithstanding *Lopez* and *Sebelius*, *supra*, the Federal Government further contends that PLCAA falls within the Commerce Clause, because it only covers guns and ammunition that traveled across state lines. Specifically, the

Act applies only to "qualified products," which the act defines as "a firearm, including any antique firearm, or ammunition, or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4) (citations omitted).

While limiting the products covered, the Act does not limit the activity involving those products. PLCAA covers all uses of those products in perpetuity without any recent or "concrete tie to interstate commerce." *Lopez*, 514 U.S. at 567. The Act immunizes the gun industry from any common-law liability that arises *anytime* after the firearm or ammunition has moved through and exited interstate commerce.[16]

---

[16] In contrast to PLCAA, an example of a valid statute that constitutionally ties the activity being regulated to interstate commerce is the National Labor Relations Act ("the NLRA"), 29 U.S.C. §§ 151-168. In *J&L Steel Corp.*, *supra*, the Supreme Court ruled that both the NLRA and the National Labor Relations Board's assertion of federal jurisdiction over labor disputes were constitutional, because the NLRA only empowered the Board to act in cases where unfair labor practices are "*affecting commerce.*" 29 U.S.C. § 160(a) (emphasis added). The NLRA did not "impose collective bargaining upon all *industry* regardless of effects upon interstate or foreign commerce." *J&L Steel Corp.*, 301 U.S. at 31 (emphasis added). Instead, the NLRA covered only activities that "may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds." *Id.*

Even there, however, the High Court warned Congressional "power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* "The question is necessarily *one of degree*." *Id.* (emphasis added).

Neither Congress nor the Federal Government provides any explanation for how state civil lawsuits and local torts involving those products burden or obstruct the free flow of interstate commerce. The bill's lead sponsor, Senator Larry Craig, justified PLCAA on the basis that members of the gun industry "had to pay higher and higher legal costs to defend themselves in lawsuit after lawsuit . . ." 151 Cong. Rec. S9,218 (daily ed. July 28, 2005).[17]

However, history has shown that litigation against manufacturers and seller of products in other industries does **not** substantially affect the free flow of such products among the several States. The costs of such lawsuits and any damages imposed are ultimately folded into the cost of the products. In this way, tort victims receive compensation, manufacturers produce safer products, and the cost of litigation and subsequent improvements is shared by those who actively participate in the marketplace.

Additionally, the filing of a state lawsuit, in state court, based on state tort law, "is in no sense **an economic activity** that might, through repetition elsewhere, substantially affect any sort of interstate commerce." **Lopez**, 514 U.S. at 567 (emphasis added). Even though lawsuits cost money and may

---

[17] I note that research from the Department of Health and Human Services refutes Senator Craig's justification. DHHS has stated, "there is simply no evidence that [pre-PLCAA] lawsuits were poised to eliminate the U.S. firearm industry." Vernick, Rutkow, & Salmon, *Availability of Litigation as a Public Health Tool for Firearm Injury Prevention: Comparison of Guns, Vaccines, and Motor Vehicle*, 97 Am. J. Public Health 1991, 1994 (2007), U.S. Department of Health and Human Services (National Institute of Health) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2040374/ (last visited January 14, 2022).

result in the exchange of money, that monetary exchange is **not** commerce. The money at issue is not transactional; it is lawful compensation for the redress of grievances between citizens under the substantive laws and sovereign power of the States. Even where, as here, the lawsuit involves parties from different states, that lawsuit does not become interstate commerce. It is interstate litigation.

Our jurisprudence has never recognized that litigation costs justify an assertion of Commerce Clause authority. Litigation costs money for nearly every defendant who must appear in court or at an administrative proceeding, not just the gun industry. Thus, if one accepts Congress's assertion that state litigation affects interstate commerce — or is interstate commerce — simply because money is involved, then **all cases** in state court would instantly come within Congressional control. This assertion, if accepted, would obliterate American federalism as we know it. It would render the 50 several states provinces of the national government, a constitutional system similar to Canada's.

For example, when spouses divorce, litigation ensues to resolve equitable distribution of property, spousal and child support, and child custody. Under Congress's assertion, such domestic litigation could affect interstate commerce, because the parties involved are subject to awards that could negatively affect their finances and property holdings. Like an industry held liable in tort, spouses involved in domestic litigation undoubtedly have their finances impacted. This in turn would affect their purchasing power and

their ability to participate in interstate commerce, such as buying a new car, going on an out-of-state vacation, and shopping online. Therefore, if one accepts Congress's litigation-costs-money theory, Congress could easily justify nationalizing family law.

The same is true for zoning and land-use disputes, as well as property-tax assessments. All these local matters could be nationalized under the theory that they lead to litigation. When people challenge the zoning or tax assessment of their real property, they choose to commence litigation. This costs money. In turn, the litigants' purchasing power is affected in the same manner discussed above, and, in the aggregate, this could substantially impact interstate commerce. Hence, under Congress's assertion, it could regulate zoning, land use, and property-tax assessments.

The examples are endless. Every law or ordinance that any state, county or municipality adopts eventually leads to litigation, where at least one party will suffer a financial detriment. This is especially true in criminal law, where a defendant could lose virtually all ability to engage in commerce. The incarceration of thousands of individuals in state prisons across America substantially impacts interstate commerce due to the prisoners' absence from the marketplace. Does that mean Congress could regulate criminal litigation by passing a national crimes code? The theory of the Federal Government and the Olson Dissent would suggest it could.

The above hypotheticals are no different than Congress relying on its claim that litigation affects commerce to justify PLCAA and thereby revamp tort law for the gun industry.

Under this breathtakingly expansive theory, it would be "as if federal officers were installed in" the filing offices of every state courthouse "and were armed with the authority to stop" any litigation Congress disfavored. *Murphy v. National Collegiate Athletic Association, Inc.*, 584 U.S. ___, ___, 138 S. Ct. 1461, 1478 (2018). "A more direct affront to state sovereignty is not easy to imagine." *Id.* I am unable and unwilling to surrender all of Pennsylvania law and sovereignty to Congress.

Indeed, as Justice Thomas warned in his *Lopez* concurrence, "if taken to its logical extreme, [the substantial-effects test] would give Congress a 'police power' over all aspects of American life." *Lopez*, 514 U.S. at 584 (Thomas, J., concurring). The Supreme Court has "*always* rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power." *Id.* (emphasis in original).

Hence, I conclude the trial court erred by accepting Congress's claim that PLCAA regulates interstate commerce. The Federal Government has failed to tie the Act to any local activity that burdens interstate commerce for constitutional purposes. Congress may not regulate those who do not actively participate in commerce with an interstate industry. Nor may it rely upon the

Commerce Clause as a catchall to use any eventual economic impact upon an

interstate industry as a pretext to legislate on purely state matters.[18]

_____

[18] In Judge Murray's Dissenting Opinion, she evaluates the constitutionality of this federal statute by applying the constitutional test for a state statute. **See** Murray Dissent, **infra**, at 16-17 (quoting **Commonwealth v. Snyder**, 251 A.3d 782, 792 (Pa. Super. 2021) (involving a constitutional challenge to a portion of the Pennsylvania Sentencing Code)). A challenger to a state statute must demonstrate that "the statute clearly, palpably, and plainly violates the constitution," **id.**, because "States have broad authority to enact legislation for the public good — what we have often called a 'police power.'" **Bond v. United States**, 572 U.S. 844, 854 (2014). Unlike state legislatures, however, Congress "lack[s] a police power." **Id.** Thus, the Federal Government "frequently **defends** . . . legislation on the ground that the legislation is authorized pursuant to Congress's power to regulate interstate commerce." **Id.** (emphasis added).

Judge Murray's claim that I impermissibly shift the burden to the Federal Government to prove PLCAA's constitutionality mischaracterizes my analysis. **See** Murray Dissent, **infra**, at 18. Instead, I only rebut the Federal Government's **defense** of PLCAA that Congress acted within its commerce-clause authority. Below and on appeal, the Federal Government advanced that defense to the Gustafsons' charge that Congress could not pass PLCAA under either the Tenth Amendment or the Commerce Clause. The Gustafsons made these claims of unconstitutionality before both the trial court and this Court. As such, they have not committed waiver.

Moreover, I respectfully suggest that the Murray Dissent repeats the error of the trial court by merely taking Congress's assertion that PLCAA is authorized under the Commerce Clause at face value. **See id.** at 19-22. Judge Murray acknowledges there are only three categories of activity that Congress may regulate pursuant to the Commerce Clause. **See id.** at 22. However, rather than demonstrate how PLCAA falls within any of them, Judge Murray simply adopts Congress's conclusion "that targeted lawsuits 'constitute an unreasonable burden on interstate and foreign commerce of the United States.'" Murray Dissent at 22 (quoting 15 U.S.C.A. § 7901(a)(6)). Without any analysis, discussion, or evidence of such a burden, Congress, the Federal Government, the trial court, and the Murray Dissent never prove their hypothesis. In their view, lawsuits substantially effect interstate commerce simply because Congress says they do; that reasoning is circular.

Thus, I would rule that PLCAA is not a valid exercise of Congress's Commerce Clause authority.

## B.    The Tenth Amendment

Having rejected the Federal Government's approach to this issue, I now turn to the Gustafsons' argument. They take the second approach in their federalism challenge – namely, they assert PLCAA invades the province of state sovereignty reserved by the Tenth Amendment. That amendment provides, "The powers not delegated to the United States by the Constitution

---

The only justification Judge Murray relies on to uphold PLCAA is preemption. **See** Murray Dissent at 21 (stating "Congress has the ability to preempt state statutes under its commerce-clause powers.") My learned colleague conflates the concept of constitutionality with preemption. "Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress." **Murphy v. National Collegiate Athletic Association, Inc.**, 584 U.S. ___, ___, 138 S. Ct. 1461, 1479 (2018). Instead, the Supremacy Clause is "a rule of decision" to resolve a conflict between two constitutionally enacted laws. **See Armstrong v. Exceptional Child Ctr., Inc.**, 575 U.S. 320, 324, (2015). Before PLCAA (or any federal statute) can preempt state law, the statute "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." **Murphy**, 584 U.S. at ____, 138 S. Ct. at 1479. In other words, a statute must be deemed constitutional before concepts of preemption come into play. A preemption analysis presupposes constitutionality.

In short, the Murray Dissent neglects to perform an independent judicial review of Congress's legal assertion that the filing of a state lawsuit, in state court, under state tort law substantially effects interstate commerce. As Chief Justice Roberts made clear, "deference in matters of policy cannot become abdication in matters of law." **National Federation of Indep. Bus. v. Sebelius**, 567 U.S. 519, 538 (2021). Nevertheless, even using Judge Murray's standard of review, the Gustafsons met their "high burden" of showing that PLCAA clearly, palpably, and plainly violates the Constitution of the United States, because Congress exceeded its enumerated powers when it passed this statute, for all the reasons I have explained above.

. . . are reserved to the States respectively, or to the people." U.S. Constitution amend. X.

The Gustafsons contend PLCAA interferes with the autonomy of States to allocate lawmaking functions between their various branches of state government. *See* Gustafsons' Brief at 34. Their argument stems from exception (iii) to the definition of "qualified-civil-liablity action." Exception (iii) permits lawsuits to proceed if they are based upon violations of state statutes, *i.e.*, a law created by a state legislature. The Act, however, bars such lawsuits if they are based upon violations of the common law, *i.e.*, decisional law created by state judiciaries.

The Gustafsons claim "PLCAA bars states from imposing liability on negligent gun companies if states have chosen to have their judiciaries establish the relevant liability standards through common law (like Pennsylvania), while allowing identical claims if the states used their legislatures to establish the relevant liability standards." *Id.* (citing 15 U.S.C. §§ 7903(5)(A)(iii)). However, Congress has "no permissible authority to infringe upon a State's decision of which branch of government it chooses to make law." *Id.*

To support their argument, the Gustafsons rely upon *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). In *Erie R.R.*, the Supreme Court of the United States said, "Congress has *no power* to declare substantive rules of common law applicable in a State whether they be local in their nature or

'general,' be they commercial law or a part of the law of torts." *Id.* at 78 (emphasis added).

The Gustafsons argue that, under *Erie R.R.*, Congress may not disfavor the common law and, at the same time, prefer the enactments of state legislatures. In other words, whether States choose to regulate the negligence and product liability of the gun industry by common law or by statute is purely a state concern. The Gustafsons allege Congress unconstitutionally disfavored and extinguished the common law of torts in the States' courts and impermissibly recodified it as federal law.

The Federal Government contends that the Gustafsons' invocation of *Erie R.R.* "is wholly out of place." Federal Government's Brief at 13 n.3. It believes "That case, which stands for the proposition that 'there is no federal general common law,' does not concern the Tenth Amendment." *Id.* (quoting *Erie R.R.* at 78). I conclude the Federal Government is incorrect.

While the Supreme Court did not cite to the Tenth Amendment in *Erie R.R.*, the decision has clear Tenth Amendment implications. *Erie R.R.* is a seminal decision of constitutional law on the allocation of powers between the States and Federal Government. The High Court held that the Constitution "recognizes and preserves the autonomy and independence of the States – independence in their legislative and independence in their judicial departments." *Id.* at 78-79. "Any interference with either, except as thus permitted, is an invasion of the authority of the States . . . ." *Id.* at 79.

*Erie R.R.* declared, "There is no federal general common law." *Id.* at 78. This holding rests upon the constitutional premise at the heart of the Gustafsons' challenge – namely, that common law (and tort law, in particular) is state law. We have no federal common law, because (1) "Congress has no power to declare substantive rules of common law applicable in a state whether they be . . . commercial law or a part of the law of torts. And [(2)] no clause in the Constitution purports to confer such a power upon the federal courts." *Id.*

The Federal Government claims PLCAA does not rewrite the common law for the gun industry, because its six exceptions allow some common-law causes of action to proceed. My review of the six exceptions reveals that the Federal Government is incorrect.[19] When PLCAA applies, it eliminates all

_____

[19] Exception (i) allows suits against a gun-industry "transferor" if under a state or federal criminal statute. *See* 15 U.S.C. § 7903(5)(A)(i). Accordingly, an underlying statutory violation is required for any tort claims to proceed.

Exception (ii) authorizes claims "for negligent entrustment or negligence *per se*." 15 U.S.C. § 7903(5)(A)(ii). Although typically a common-law tort, negligent entrustment is defined in PLCAA at 15 U.S.C. § 7903(5)(B). Thus, Congress set a **statutory** standard for negligent-entrustment claims against the gun industry. Likewise, negligence *per se* allows cases where the gun industry allegedly violated a statute. **See, e.g., Bumbarger v. Kaminsky**, 457 A.2d 552, 555 (Pa. Super. 1983). Hence, only Congress and state legislatures define the duty of care under Exception (ii).

Exception (iii) permits actions to proceed if based on "a state or federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii). Clearly, this exception is not based upon common-law claims.

common-law-tort claims against the gun industry. Thus, I agree with the Gustafsons' Tenth Amendment claim. Congress aimed the PLCAA-tort-reform bill directly at the common law and expressly disapproved such causes of action while favoring the statutes of state legislatures and its own.

Tort law is decidedly a state issue. If courts allow Congress to regulate tort litigation involving these products, it could eventually regulate all litigation. This is not permitted under the Constitution of the United States' principles of federalism. As such, I conclude that Section 7902(b) of PLCAA, which directs courts to dismiss common-law claims that fall within the definition of "qualified-civil-liability action," violates the Tenth Amendment.

---

Exception (iv) allows lawsuits based on breach of contract and warranty relating to the sale of firearms. 15 U.S.C. § 7903(5)(A)(iv). This exception likewise requires plaintiffs to prove statutory violations, because all 50 States have adopted the Uniform Commercial Code ("the UCC"). Firearms and ammunition are "goods" under the UCC. *See* 13 Pa.C.S.A. § 2105(a); *see also* UCC, Art. II, § 105(a). Thus, the UCC applies to any "action for breach of contract or warranty in connection with the purchase of a qualified product," 15 U.S.C. § 7903(5)(A)(iv), not the common law of assumpsit.

Exception (v) never preserves the common law of product defect. As discussed above, the exception's caveat renders it a nullity.

Finally, Exception (vi) permits the Attorney General of the United States to bring lawsuits based upon "chapter 44 of Title 18 or chapter 53 of Title 26." 15 U.S.C. § 7903(5)(A)(vi). Obviously, this last exception allows no claims at common law, but only suits based on violations of the listed federal statutes.

PLCAA therefore grants total immunity from common-law liability to the gun industry whenever the Acts applies.

Consequently, I would hold that Section 7902(b) of PLCAA is repugnant to the Constitution of the United States and declare PLCAA's dismissal mandate "void." *Marbury*, 5 U.S. at 180.

### C.    *Severability*

Finally, having determined the dismissal mandate of PLCAA (Section 7902) is unconstitutional, I must address the question of severability. *See Seila Law LLC v. C.F.P.B.*, 591 U.S. ___, ___, 140 S. Ct. 2183, 2209 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508, (2010)).  If Congress would not have enacted a statute's constitutional provisions without its unconstitutional terms, then the constitutional provisions are not severable; the entire statute must be declared unconstitutional.  *See id.*

The only portions of PLCAA that do not offend the Constitution are its findings and purposes (in Section 7901) and its definitions (in Section 7903). These provisions have no force on their own.  Accordingly, Congress would not have enacted the constitutional provisions of PLCAA standing alone.  For this reason, I believe the rest of PLCAA is not severable and would declare the Act unconstitutional in its entirety.

### CONCLUSION

The constitutional safeguards that override PLCAA are the structural pillars of American government.  These principles ensure that local matters remain under the local authority of the States, and they prevent the Federal Government from becoming all powerful.  While such principles may be "less

romantic and have less obvious a connection to personal freedom than the provisions of the Bill of Rights or the Civil War Amendments," **Sebelius**, 567 U.S. at 707, (Scalia, J. dissenting), federalism is fundamental to liberty. It permits the 50 Experiments in Democracy, which the People perform in their state legislatures and courthouses across this Nation on a daily basis. Congressional tort-reform bills, like PLCAA, have no place in that system; tort law and statutes reforming it are reserved to the States under the Tenth Amendment.

I recognize that state courts do not typically resolve claims involving the constitutionality of federal statutes. However, that is the issue presented by the facts of the case before us. The Gustafsons filed a product-liability lawsuit under Pennsylvania common law, which, but for a federal statute, would have proceeded through our state courts like every other civil action. When their claims were abruptly dismissed under PLCAA, the question of that federal law's constitutionality fell squarely before us, and we must answer it. **See, e.g.**, **Robb v. Connolly**, 111 U.S. 624, 637 (1884) (holding that state courts and federal courts coequally share the obligation to decide federal constitutional questions).

Although a Congressional statute would normally preempt state law, preemption only occurs if the statute comports with the Constitution of the United States. **See Marbury**, 5 U.S. at 178. Here, I find the Constitution – the Supreme Law of the Land – did not authorize Congress to pass PLCAA. The Act is an exercise of police power that the Tenth Amendment reserves for

the sovereign States. Thus, to discharge my judicial duty to follow the Supreme Law of the Land, I would declare the inferior PLCAA statute void. ***See id.*** I express no opinion on the merits of the Gustafsons' lawsuit or whether the gun is defective. Likewise, my decision does not implicate the right to bear arms under the federal or Pennsylvania constitutions. I only conclude that, under the Constitution of the United States, the Gustafsons' products-liability lawsuit is a local matter that a jury in Westmoreland County, not Congress, must decide.

President Judge Panella and Judge Lazarus join this Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/12/2022</u>